THE NEWS AND OBSERVER PUBLISHING COMPANY, A CORPORATION, FRANK A. DANIELS, JR., CLAUDE SITTON, AND JOYE BROWN v. WAKE COUNTY HOSPITAL SYSTEM, INC., ETTA S. CREECH, MARJORIE B. DEBNAM, CURTIS M. THOMPSON, HARVEY L. MONTAGUE, J. T. LINDLEY, ODELL C. KIMBRELL, JR., M.D., REX G. POWELL, M. EDMUND AYCOCK, JAMES MICHAEL WEEKS, AND WILLIAM F. ANDREWS, SR.

No. 8110SC274

(Filed 1 December 1981)

1. **Counties § 4; Hospitals § 1; Public Records § 1— county hospital system— agency of the county**

The Wake County Hospital System, Inc. is an "agency" of Wake County within the purview of the public records statute, G.S. 132-1, notwithstanding it is a non-profit corporation and an independent contractor, where the Hospital System's articles of incorporation provide that it will transfer its assets to the county upon its dissolution and that all vacancies on the board of directors will be subject to approval by the county commissioners; the lease agreement between the Hospital System and the county provides that the Hospital System is to occupy premises owned by the county under a lease for $1.00 a year, that the county commissioners shall review and approve the Hospital System's annual budget, that the county shall conduct a supervisory audit of the Hospital System's books, and that the Hospital System shall report its charges and rates to the county; and the operating agreements provide that the Hospital System shall be financed by county bond orders, that revenue collected pursuant to the bond orders shall be revenue of the county, and that the Hospital System will not change its corporate existence or amend its articles of incorporation without the county's written consent.

2. **Public Records § 1— access to records of county hospital system**

Records of the Wake County Hospital System, Inc. pertaining to the terms of settlements reached in three actions against it by medical professional associations and expense accounts submitted by the Hospital System's

1

Publishing Co. v. Hospital System, Inc.

president and board of directors are "public records" made "pursuant to law or ordinance in connection with the transaction of public business" within the meaning of G.S. 132-1 and must be disclosed under North Carolina's public records statutes. G.S. 143-318.10(b); G.S. 159-39(a).

APPEAL by defendants from *Lee, Judge.* Summary judgment for plaintiff entered 6 January 1981 in Superior Court, WAKE County. Heard in the Court of Appeals 20 October 1981.

This is an action by the News and Observer Publishing Company [hereinafter referred to as the newspaper] to compel the Wake County Hospital System, Inc. [hereinafter referred to as the System] to reveal the terms of settlements reached in three actions against the System by medical professional associations for wrongful termination of agreements by the System, and to reveal expense account records of the System's president and board of directors.

Upon the newspaper's motion for summary judgment, the trial judge found no genuine issue as to any material fact, granted judgment as a matter of law to the newspaper, and concluded that the System is an "agency" of Wake County as defined by G.S. 132-1 and that its records are "public records" as defined by G.S. 132-1 which are subject to "inspection, examination and copying" by the newspaper, except for confidential communications by counsel as defined by G.S. 132-1.1. The trial judge specifically found that the System refused, upon demand by the newspaper, to permit inspection, examination, and copying of the minutes of every board of directors and committee meeting "at which there were deliberations or voting or other actions [by the System] with respect to the settlement of the claims and litigation involved in civil actions" by the three medical professional associations. The System also refused to permit examination and copying of the settlement documents, every check or voucher issued by the System in payment of the settlements to each claimant, and every record of all expense accounts submitted by the president and board of directors of the System over the past five years. Further, it was found that the action authorizing the settlement of one of the claims against the System was taken during an executive session of the board of directors, and the terms of such settlement were not reported in the minutes of the System's board of directors in violation of G.S. 143-318.11(a)(4). The System's attorney also

reported to the board of directors " 'on the three (3) complaints above referred to, and [the board] authorized the settlement of such claims' " at the executive sessions, as well as regular meetings. The trial judge concluded that there was no showing that public inspection of the minutes of the executive sessions when the claims were discussed would "frustrate the purpose of the executive session" under G.S. 143-318.11(d), and that the newspaper is entitled to inspect, examine, and have copies of the records specified.

The trial judge ordered the System to make these records available to the newspaper and to report in the minutes of the board of directors the terms of the settlement authorized in executive session. The System appeals.

*Lassiter & Walker, by William C. Lassiter, for plaintiff-appellees.*

*Hollowell, Silverstein & Brady, by Edward E. Hollowell and Bruce D. Mitchell; and Harris, Cheshire, Leager & Southern, by W. C. Harris, Jr., for defendant-appellants.*

HILL, Judge.

On 25 May 1955, the Wake County Board of Commissioners [hereinafter referred to as the Commissioners] followed the recommendation of a "hospital survey" ordered by them in 1954 and created the Wake County Hospital Authority [hereinafter referred to as the Authority]. One county commissioner and six other citizens were named to the board of trustees of the Authority. By resolution on 18 July 1955, the Commissioners vested in the Authority "duties and powers for the planning, establishment, construction, maintenance and operation of a county hospital . . .." The Commissioners further resolved that they would have the power to remove any member of the Authority for misconduct "or for other causes which in the sound discretion of the board renders such member as unfit or disqualified to serve." Also, the county treasurer would have custody of "all funds of the hospital . . . and establish and maintain an accounting system in such manner as to give a true and accurate accounting of all the financial transactions of the hospital and clinics." The Authority, however, would retain control over the expenditures of moneys collected through the operation of its hospitals and clinics. In ad-

dition, the Authority would have the power to adopt its own by-laws and to select and hire all necessary employees and assistants. Significantly, the resolution states that "[t]he Hospital shall be operated at all times, and in every respect administered as a charitable, non-profit hospital; no part of the net earnings of the Hospital shall ever inure to the benefit of any individual, firm, corporation or private shareholder." Further, title to all property for hospital purposes would be vested in the County, although the Authority could purchase necessary equipment. The Commissioners also placed certain fiscal limitations upon the Authority: (1) that the Commissioners review and approve the annual budget of the Authority; (2) that the Authority not borrow money, undertake additional programs, or other expenditures without the approval of the Commissioners; and (3) that a representative of the Commissioners be permitted to attend meetings, review the Authority's records, and make audits necessary in connection with indigent's records.

On 7 June 1965, the Commissioners unanimously approved a resolution adopted by the Authority "to convert Wake Memorial Hospital to a non-profit corporation." Three months later the Commissioners officially approved the articles of incorporation of the System, a lease agreement between the county and the System, and an agreement between the county and the System for the care and treatment of indigent patients.

The System's articles of incorporation, filed 9 September 1965, provide, as did the Commissioners' resolutions creating the Authority, that "[t]he corporation shall not have and issue capital stock and shall be operated without profit to the members or their successors, and no part of the net earnings shall inure, or may lawfully inure, to the benefit of any member or individual." Further, in the event of dissolution of the corporation, "all of its moneys, properties, and other assets" would be donated, transferred and delivered to the county to be used by the county "exclusively for the accomplishments of the purposes for which the corporation is formed." The articles of incorporation also provide that all vacancies in the membership of the System's board of directors would be "subject to the approval of the Board of County Commissioners of Wake County . . .."

The lease agreement entered into by the county and the System on 7 September 1965 provided for a renewable five-year

term; the annual rental was $1.00 per year during the term. The county also placed certain fiscal limitations upon the System very similar to limitations placed upon the Authority by the Commissioners: (1) that the Commissioners review and approve the annual budget of the System; (2) that the System make its records available to an independent auditor mutually satisfactory to the county and the System; (3) that a representative of the county be permitted to attend meetings, review the System's records, and make audits necessary in connection with indigents' records; (4) that the System file with the county a schedule of its charges and rates; and (5) that the System operate its facilities in accordance with standard practices for operating hospitals in North Carolina. The System was operated under this lease agreement until 1 January 1975.

On 1 January 1975, the System became subject to an operating agreement entered into by it and the county. Included in the agreement was a bond order authorizing the issuance of $34,775,000 in revenue bonds which were identified as "Bonds of the County." Pursuant to the bond order, the System agreed to collect revenues for deposit to the revenue fund which "constitute[s] revenues of the County derived from the ownership of the System by the County . . .." The System further agreed to make its records available to the county and furnish it copies of audited financial statements and additional audits and reports as required by law. Upon the termination of this agreement, in accordance with the amended articles of incorporation, the System agreed to "transfer, assign and convey to the County, without any consideration therefor, any and all moneys, properties and other assets" of the System except as otherwise required by law. The System also agreed that it would not change its corporate existence, nor further amend its articles of incorporation, "without the prior written consent of the County." Finally, the System and the county "understood and agreed that the [System] is an independent contractor and that none of the Trustees, officers, employees or agents of the [System] is or shall be deemed to be an agent or employee of the County by reason of anything contained in this Agreement."

After two and one-half years of operation under the 1975 agreement, the county and the System entered into a new operating agreement on 1 June 1977. Included in this agreement

was another bond order of $41,535,000 adopted by the Commissioners to refund the 1975 revenue bonds. The significant provisions of this operating agreement and the 1975 agreement are substantially the same. At all times it has been the purpose of the System "to provide for the care and maintenance of the indigent sick and afflicted poor of Wake County through the continued assistance of contributions by the County."

On 19 December 1978, three separate civil actions were begun against the System by three medical professional associations—David Lane Jones, M.D.,P.A.; Morton Meltzer, M.D.,P.A.; and Cary Family Medicine and Ambulatory Care Center, P.A.—for alleged wrongful termination of agreements to provide professional services to the System by each plaintiff. Each of the civil actions subsequently was dismissed, and the controversies were concluded by settlements. The newspaper was refused permission by the System to examine and copy its records pertaining to those settlements, and the crux of the case *sub judice* is whether those records and the expense account records later requested by the newspaper, are public records which must be disclosed under North Carolina's public records statutes. *See* G.S. 132-1 to -9.

This case is before us on appeal from the trial judge's granting of summary judgment for the newspaper. Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law." G.S. 1A-1, Rule 56(c). In ruling on a motion for summary judgment, the trial judge does not decide issues of fact but merely determines whether a genuine issue of fact exists. *Vassey v. Burch*, 301 N.C. 68, 269 S.E. 2d 137 (1980); *Singleton v. Stewart*, 280 N.C. 460, 186 S.E. 2d 400 (1972). "Accordingly, the party moving for summary judgment has the burden of clearly establishing the lack of any triable issue of fact by the record properly before the court and his entitlement to judgment as a matter of law." *Vassey v. Burch, supra* at 72, 269 S.E. 2d at 140.

At the outset of this opinion, we find the facts as recounted above to be uncontroverted. The trial judge therefore was correct in concluding that there is no genuine issue as to any material fact in the case *sub judice*. Our review of the newspaper's sum-

mary judgment must focus upon the propriety of the trial judge's conclusions of law and whether they are supported by the facts.

G.S. 132-1 identifies for us which of the trial judge's legal conclusions are crucial to our review:

> "Public record" or "public records" shall mean all documents, papers, letters, maps, books, photographs, films, sound recordings, magnetic or other tapes, electronic data-processing records, artifacts, or other documentary material, regardless of physical form or characteristics, *made or received pursuant to law or ordinance in connection with the transaction of public business by any agency of North Carolina government or its subdivisions.* Agency of North Carolina government or its subdivisions shall mean and include every public office, public officer or official (State or local, elected or appointed), institution, board, commission, bureau, council, department, authority or other unit of government of the State or of any county, unit, special district or other political subdivision of government. (Emphasis added.)

Under this statute, two questions must be answered: First, whether the trial judge was correct in concluding that the System is an "agency of North Carolina government or its subdivisions"; i.e., Wake County; and second, if the System is an agency, whether its records are "public records" that were "made or received pursuant to law or ordinance in connection with the transaction of public business . . .."

In deciding whether it is an agency of Wake County, the System urges us to consider, among other statutes, the Municipal Hospital Facilities Act, G.S. 131-126.18 to .30, and the Health Care Facilities Finance Act, G.S. 131A-1 to -25, *in pari materia* with the public records statutes. Those statutes show, the System argues, that the legislature did not intend it to be a "public agency or subdivision of the State."

It is established that "[u]nder the rules of statutory construction, statutes *in pari materia* must be read in context with each other." *Cedar Creek Enterprises, Inc. v. Department of Motor Vehicles*, 290 N.C. 450, 454, 226 S.E. 2d 336, 338 (1976). *Accord, Newlin v. Gill*, 293 N.C. 348, 237 S.E. 2d 819 (1977). "*In pari*

*materia*" is defined as "[u]pon the same matter or subject." Black's Law Dictionary 898 (4th ed. 1968). It is abundantly clear that the statutes referred to above are not of the "same matter or subject" as the public records statutes. We therefore are obliged only to construe the phrase "agency of North Carolina government or its subdivisions" upon the plain meaning of G.S. 132-1 and in the context of the public records statutes.

There is no decisional law in North Carolina construing the agency requirement of the public records statutes. However, decisional law in the federal jurisdiction has established some guidelines for the meaning of the term "agency" in the Administrative Procedure Act [hereinafter referred to as the APA]. Under the APA, an agency "means each authority of the Government of the United States, whether or not it is within or subject to review by another agency . . .." 5 U.S.C.A. § 551. The North Carolina statute's definition of the phrase "agency of North Carolina government or its subdivisions" is more specific than the APA definition:

> Agency of North Carolina government or its subdivisions shall mean and include every public office, public officer or official (State or local, elected or appointed), institution, board, commission, bureau, council, department, authority or other unit of government of the State or of any county, unit, special district or other political subdivision of government.

G.S. 132-1. In spite of this difference in definitions, we find the federal decisional law under the APA instructive in this case.

*Soucie v. David*, 448 F. 2d 1067 (D.C. Cir. 1971), is a leading case in construing the term "agency" in the APA for application to the Freedom of Information Act. The court declared that "the APA apparently confers agency status on any administrative unit with substantial independent authority in the exercise of specific functions." *Id.* at 1073. Administrative entities that neither perform rule-making nor adjudicative duties also may be agencies. *Id. Accord, Koden v. Department of Justice*, 564 F. 2d 228 (7th Cir. 1977). "The important consideration is whether [the administrative entity] has any authority in law to make decisions." *Washington Research Project, Inc. v. Department of Health, Education & Welfare*, 504 F. 2d 238, 248 (D.C. Cir. 1974), *cert. denied*, 421 U.S. 963 (1975).

One commentator has suggested that the legislative history of the APA reflects "a desire to use the term 'agency' to identify centers of gravity of the exercise of administrative power. Where a center of gravity lies, where substantial 'powers to act' with respect to individuals are vested, there is an administrative agency for purposes of the APA." J. Freedman, *Administrative Procedure and the Control of Foreign Direct Investment*, 119 U. Pa. L. Rev. 1, 9 (1970) [hereinafter referred to as Freedman].

[1]  The documents creating the System support our conclusion that it is a separate administrative entity which has the power to govern its daily functions with certain supervision and control by the county. Since the System clearly has "independent authority" in the function of its task "to provide for the care and maintenance of the indigent sick and afflicted poor of Wake County," the System falls within the guidelines of the federal jurisdiction defining "agency" in the APA. The critical determination is, however, whether this "independent authority" so overshadows the county's supervisory responsibilities that it forecloses a conclusion that the System is an "agency *of North Carolina government or its subdivisions;*" i.e., Wake County. We hold that it does not, and find that the System is an agency of the county under the North Carolina public records statutes.

The System argues that its status as a "private, non-profit corporation" and "independent contractor" is exclusive of the status of agency under the public records statutes. However, several courts have found corporate entities to be agencies of local government for a variety of purposes. Most notably, in *Coats v. Sampson County Memorial Hospital, Inc.*, 264 N.C. 332, 141 S.E. 2d 490 (1965), our Supreme Court found a hospital organized as a non-stock, non-profit corporation to be an agency of Sampson County for venue purposes. The hospital was governed by a board of trustees appointed by the Sampson County Board of Commissioners, it occupied premises owned and provided by the county under a lease, and in the event of dissolution, the hospital was obligated to transfer its assets to the county. *Id.* Justice Sharp, later Chief Justice, wrote for the Court:

> Admittedly defendant is not a municipality in the sense of a political subdivision such as a city or a town or a quasi-municipality like a county. (Citation omitted.) G.S. 131-126.28

does, however, declare the establishment, construction, maintenance and operation of hospital facilities to be public and governmental functions; and, under the provisions of G.S. 131-126.20 and G.S. 131-126.21(a), Sampson County has delegated to defendant its authority to exercise these functions. Defendant is, therefore, an agency of Sampson County . . ..

*Id.* at 334, 141 S.E. 2d at 492.

In *Sides v. Cabarrus Memorial Hospital, Inc.,* 287 N.C. 14, 18, 213 S.E. 2d 297, 300 (1975), a hospital was created by legislative act as a "body corporate." The Court noted that the act granted "the county the authority to levy a special tax to provide for the operation and maintenance of the hospital and to substantially control its operations through the county board of commissioners . . .." *Id.* Based upon examination of the legislative acts of creation and relevant administrative rulings, the Court found the hospital to be an agency of Cabarrus County, maintained thereby as a "proprietary function," and therefore liable in tort for the negligent acts of its employees committed in the scope of their employment. *Id.*

Similarly, a board of trustees of a public library, organized as " 'a separate corporate entity' by the Act under which it came into being," was found to be an agency of the City of Newark, New Jersey, and thereby subject to laws affecting contracts with municipalities. *Glick v. Trustees of Free Public Library,* 2 N.J. 579, 582, 67 A. 2d 463, 464 (1949). The court examined the relationship between the library and the municipality and concluded that "[the Trustees'] incorporation as a body politic . . . in itself does not give rise to a relationship radically different in character from that which would otherwise exist. It is that substance and not the form of the creation that is the key to the legislative design." *Id.* at 583-84, 67 A. 2d at 465.

In *Moberly v. Herboldsheimer,* 276 Md. 211, 345 A. 2d 855 (1975), a hospital with corporate status was found to be an agency of the City of Cumberland, Maryland, and thereby subject to that state's public information law. Among other things, "[a] survey of the enactments relative to the Hospital, including, specifically, the statements relative to the relationship of the Hospital to the City of Cumberland . . . leads to the conclusion that the Hospital is in

fact an agency of the City of Cumberland." *Id.* at 225, 375 A. 2d at 862-63. Likewise, the District Court of Appeal of Florida found "a nonprofit corporation composed of public spirited citizens" to be an agency within the purview of that state's public records law. *Schwartzman v. Merritt Island Volunteer Fire Dept.*, 352 So. 2d 1230, 1231 (Fla. App. 1977).

Although these cases illustrate that a corporate entity also may be considered an agency of local government, even for the purposes of state public records statutes, they are not entirely dispositive of the case *sub judice.* "The unavoidable fact is that each new arrangement must be examined anew and in its own context." *Washington Research Project, Inc. v. Department of Health, Education & Welfare, supra* at 246. *See also Public Citizen Health Research Group v. Department of Health, Education & Welfare,* 449 F. Supp. 937 (D.C. 1978). As did the courts in the above cases, we now must look at the nature of the relationship between the System and the county to determine that the System is an "agency of North Carolina government or its subdivisions."

Wake County's supervisory responsibilities and control over the System are manifest. The System's articles of incorporation provide (1) that upon its dissolution, the System would transfer its assets to the county; and (2) that all vacancies on the board of directors would be subject to the Commissioners' approval. The lease agreement provided (3) that the System occupy premises owned by the county under a lease for $1.00 a year; (4) that the Commissioners review and approve the System's annual budget; (5) that the county conduct a supervisory audit of the System's books; and (6) that the System report its charges and rates to the county. The operating agreements also provide (7) that the System be financed by county bond orders; (8) that revenue collected pursuant to the bond orders be revenue of the county; and (9) that the System would not change its corporate existence nor amend its articles of incorporation without the county's written consent.

The Municipal Hospital Facilities Act also sheds light upon the nature of the System's relationship to the county in congruence with the articles of incorporation, lease, and operating agreements which we have reviewed. G.S. 131-126.28, for example, states that the operation of a county hospital is a "public and

governmental" function, "exercised for a public purpose," and thereby a county function. *See Coats v. Sampson County Memorial Hospital, Inc., supra.*

We note that this relationship between the System and the county was not a radical change from the relationship between the Authority and the county. Most significantly, the entity created by resolution in 1955, "a charitable, non-profit hospital," remained as such under the System's articles of incorporation. The county further retained its ownership and fiscal controls upon the System in a manner virtually identical to those upon the Authority. In short, the relationship between the county and its hospitals has undergone little more than a change of name through incorporation. "[T]he title of the authority in question, whether it be 'agency' or 'board' or 'bureau' or 'office' or 'department,' is irrelevant to assessing the power it exerts." Freedman, 119 U. Pa. L. Rev. at 9.

The System has conceded on oral argument that, as the Authority, it was an agency of Wake County. The history of the System's existence since its incorporation mandates the same concession. These ties to the county lead us to the inescapable conclusion that the System exercises its "independent authority" so intertwined with the county that it must be, and is, an "agency of North Carolina government or its subdivisions;" i.e., Wake County.

[2]  Since the System is an agency of Wake County under our public records statutes, we now must determine whether its records are "public records" that were "made or received pursuant to law or ordinance in connection with the transaction of public business . . .." G.S. 132-1. The newspaper seeks inspection and examination of two types of records: first, records reflecting the terms of settlements reached in three actions against the System by medical professional associations; and second, expense account records submitted by the System's president and board of directors.

G.S. 143-318.11(a)(4) requires a "public body" to report its consideration of settlement terms in executive session by entering the terms "into its minutes within a reasonable time after the settlement is concluded." By virtue of the definitions in G.S. 143-318.10(b) and G.S. 159-39(a), we find that the System is a

"public body" that must, by law, record settlement terms considered in executive sessions. In addition, the public has the right to know the terms of settlements made by the System in actions for wrongful terminations of its agreements since the funds from which the settlements were paid must be considered the county's funds. *See Miami Herald Publishing Co. v. Collazo,* 329 So. 2d 333 (Fla. App. 1976); *Courier Journal v. McDonald,* 524 S.W. 2d 633 (Ky. App. 1974). Therefore, we conclude that the documents connected with the settlement terms in the case *sub judice* are "public records" which were "made . . . pursuant to law . . . in connection with the transaction of public business . . .."

We reach the same conclusion regarding the expense accounts submitted by the System's president and board of directors. The phrase in G.S. 132-1, "pursuant to law or ordinance in connection with the transaction of public business," should include, in addition to those records required by law, those records that are kept in carrying out lawful duties. *See* Comment, *Administrative Law—Public Access to Government-Held Records: A Neglected Right in North Carolina,* 55 N.C.L. Rev. 1187 (1977); J. Johnson & D. Lawrence, *Interpreting North Carolina's Public Records Law,* 10 Local Gov't. L. Bull. 1 (Inst. of Gov't., Chapel Hill, N.C., 1977). The statute therefore includes the expense account records submitted by the System's president and board of directors while carrying out their lawful duties. Those records, then, also are "public records" under G.S. 132-1.

We conclude that the trial judge's conclusions of law are supported by the facts as found. Thus, the summary judgment for the newspaper was not improvidently granted.

We have carefully examined the System's remaining arguments and assignments of error and find each to be without merit. For all of the reasons discussed above, the summary judgment for the newspaper is

Affirmed.

Judges VAUGHN and WHICHARD concur.