S. Envtl. Law Ctr. v. N.C. R.R. Co., 2020 NCBC 61.

NORTH CAROLINA

WAKE COUNTY

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
19 CVS 500268

SOUTHERN ENVIRONMENTAL
LAW CENTER,

           Plaintiff,

v.

The NORTH CAROLINA RAILROAD
COMPANY,

and

MICHAEL WALTERS, JACOB F.
ALEXANDER III, WILLIAM V.
BELL, MARTIN BRACKETT, LIZ
CRABILL, WILLIAM H.
KINCHELOE, JAMES E. NANCE,
JOHN M. PIKE, GEORGE
ROUNTREE III, FRANKLIN ROUSE,
NINA SZLOSBERG-LANDIS, and
MICHAEL L. WEISEL, in their
official capacities as members of the
Board of Directors of the North
Carolina Railroad Company,

           Defendants.

**ORDER AND OPINION ON
CROSS-MOTIONS FOR
SUMMARY JUDGMENT[1]**

1.    **THIS MATTER** is before the Court on Plaintiff's Motion for Summary Judgment filed by Plaintiff Southern Environmental Law Center ("SELC") on December 23, 2019, (ECF No. 39), and on Defendants' Motion for Summary Judgment

---

[1] Recognizing that this Order and Opinion cites and discusses the subject matter of documents that the Court had provisionally allowed to remain filed under seal in this case, the Court elected to file this Order and Opinion under seal on August 20, 2020. (ECF No. 80.) The Court permitted the parties to file proposed redactions, if any, to this Order and Opinion. On August 31, 2020, both Plaintiff and Defendants advised the Court that no redactions are necessary. Accordingly, the Court now removes the "Filed Under Seal" designation and files this Order and Opinion, without redactions, as a matter of public record.

filed by Defendants[2] the North Carolina Railroad Company ("NCRR"); and Michael Walters, Jacob F. Alexander III, William V. Bell, Martin Brackett, Liz Crabill, William H. Kincheloe, James E. Nance, John M. Pike, George Rountree III, Franklin Rouse, Nina Szlosberg-Landis, and Michael L. Weisel, all in their official capacities as members of the Board of Directors of the NCRR (collectively, "Defendants") on January 13, 2020, (ECF No. 41) (both motions together, the "Cross-Motions"). After full briefing on the Cross-Motions and a hearing held on August 13, 2020, for the reasons stated herein, the Court **GRANTS** summary judgment in Defendants' favor.

*Southern Environmental Law Center, by Kimberley Hunter, Ramona McGee, and Maia Hutt, for Plaintiff.*

*Womble Bond Dickinson (US) LLP, by James P. Cooney, Russ Ferguson, and Rebecca C. Fleishman, for Defendants.*

Robinson, Judge.

## I.     INTRODUCTION

2.     The issue before the Court is one of first impression in this State: is a corporation that is owned 100% by the people of the State of North Carolina, but is otherwise organized and in existence pursuant to Chapter 55 of our General Statutes, subject to the North Carolina Public Records Act, N.C.G.S. §§ 132-1–132-11 ("Public

---

[2] Scott M. Saylor, in his official capacity as President of the NCRR, was previously the first named defendant in this case. However, as of July 31, 2020, Saylor is no longer President of the NCRR, no longer has an official capacity with the NCRR, and is therefore no longer a custodian of NCRR's records for purposes of N.C.G.S. § 132-1, *et seq*. Accordingly, pursuant to the Court's August 3, 2020 Order on Consent Motion to Dismiss Certain Defendants, (ECF No. 79), Saylor was dismissed from this action, and his name was removed from the case caption. *See also S. Envtl. L. Ctr. v. Saylor*, 2019 NCBC LEXIS 60 (N.C. Super. Ct. Sep. 11, 2019) (denying Defendants' Motion for Judgment on the Pleadings and identifying Saylor in the case caption).

Records Act" or the "Act")? The specific entity involved in this case is the NCRR, which—by the admissions of both parties—is distinct from other private corporations in a number of ways, including the fact that it is wholly owned by the State of North Carolina and works for the benefit of the people of North Carolina. These facts aside, nowhere within the perimeters of the Public Records Act has the Legislature expressly stated that the NCRR is, or is not, subject to the Act. Nor is there any other statute that directly addresses this point.

## II.    FACTS AND PROCEDURAL HISTORY

3.    The Court does not make findings of fact when ruling on motions for summary judgment. *See In re Estate of Pope*, 192 N.C. App. 321, 329, 666 S.E.2d 140, 147 (2008). The following background, taken from the evidence submitted in support of and in opposition to the Cross-Motions, is intended only to provide context for the Court's analysis and ruling.

### A.    The Parties and Procedural History

4.    SELC is a section 501(c)(3) non-profit organization chartered as a North Carolina non-profit corporation with its principal place of business in Charlottesville, Albemarle County, Virginia. (Compl. ¶ 1, ECF No. 3 ["Compl."]; Answer ¶ 1, ECF No. 5 ["Answer"].) SELC maintains registered offices in North Carolina. (Compl. ¶ 1; Answer ¶ 1.) SELC, which works to protect the environment in a host of ways, advocated in favor of the Durham-Orange Light Rail transit project (the "Light Rail Project"). (Compl. ¶ 2.) The Light Rail Project was a planned 17.7 mile light rail line linking Durham and Chapel Hill, North Carolina. (Compl. ¶ 2, fn. 1.)

5. The NCRR is a North Carolina corporation with its principal place of business in Raleigh, Wake County, North Carolina. (Compl. ¶ 4; Answer ¶ 4.) Walters is the Chairman of the NCRR Board of Directors and is a custodian of its public records. (Compl. ¶ 5; Answer ¶ 5.) The remaining individual defendants are all members of the NCRR Board of Directors and are also custodians of its records. (Compl. ¶¶ 6–17; Answer ¶¶ 6–17.) All individual defendants are sued in their official capacities. (Compl. ¶¶ 3, 5–17; Answer ¶¶ 3, 5–17.)

6. SELC alleges that the NCRR owns some of the existing tracks that the Light Rail Project would travel alongside through downtown Durham and that the NCRR refused to sign a cooperative agreement with other Light Rail Project partners. (Compl. ¶ 2, fn. 1.) Through this lawsuit, SELC seeks certain records from the NCRR related to the Light Rail Project. (Compl. ¶ 51.)

7. On May 23, 2019, SELC submitted a request to Saylor (NCRR's President at the time) in which it sought to inspect all records in the NCRR's possession or control related to the Light Rail Project generated since January 1, 2018. (Compl. ¶ 51; Ex. A to Compl.) On June 25, 2019, the NCRR's counsel replied in a letter to SELC that "because NCRR is not subject to the [Public Records] Act, it will not be producing materials in response to [the SELC's] request[.]" (Compl. ¶ 52; Ex. B to Compl.)

8. As a result of these communications, SELC filed the instant lawsuit on July 1, 2019. (ECF No. 3.) Thereafter, on August 2, 2019, Defendants filed their Answer, (ECF No. 5), and simultaneously filed a Notice of Designation to the North Carolina

Business Court, (ECF No. 6). This case was designated as a mandatory complex business case by order of the Chief Justice of the Supreme Court of North Carolina on August 5, 2019, (ECF No. 1), and was assigned to the undersigned by order of the Chief Business Court Judge on that same date, (ECF No. 2).

9. On August 2, 2019, Defendants filed their Motion for Judgment on the Pleadings pursuant to Rule of Civil Procedure 12(c), (ECF No. 7). The Court denied this motion following full briefing and a hearing on the merits. *S. Envtl. L. Ctr.*, 2019 NCBC LEXIS 60.

10. Following discovery and in compliance with the Case Management Order entered in this case, (ECF No. 31), Plaintiff and Defendants filed the Cross-Motions, which were fully briefed. The parties filed a Joint Appendix. (ECF No. 70) (hereinafter "JA").

11. The Court held a hearing by video conference on the Cross-Motions on August 13, 2020. (*See* ECF No. 76.) The Cross-Motions are ripe for resolution.

**B.     Establishment of the NCRR and Statutory Regime**

12. The NCRR was incorporated by an act of the North Carolina General Assembly (the "General Assembly") in 1849. 1848-1849 N.C. Laws, CH LXXXII, § 1 (Jan. 27, 1849) (hereinafter the "NCRR Charter"). The NCRR Charter provides that the NCRR shall "have a corporate existence as a body politic in perpetuity." *Id*. The NCRR was specifically tasked with building a railroad from the junction of the Wilmington and Raleigh Rail Road in Wayne County to Charlotte. *Id*.

13.    In establishing the NCRR, the State of North Carolina initially paid $2 million to become its majority shareholder. *Id.* § 36. Under the NCRR Charter, the State of North Carolina possessed exclusive power to appoint directors to the NCRR's board. *Id.* § 43.

14.    In 1992, the State explored whether to purchase the remaining privately-held shares of the NCRR. (JA–0100.) A special study group report recommended that the State purchase the remaining privately-held shares to further "enable[] the State to use this asset in a manner that it deems best for the State and its citizens as a whole." (JA–0106–07.)

15.    In 1997, the General Assembly authorized the buyout of the private shares of the NCRR "to help promote trade, industry, and transportation within the State of North Carolina and to advance the economic interests of the State." 1997 N.C. Sess. Laws 443, § 32.30. In 1998, the State loaned the NCRR $61 million to complete this buyout, which the NCRR repaid within five years and paid interest on for two years. (JA–0198, 0884–86.) This buyout was unsuccessfully challenged by minority, private shareholders. *See Werner v. Alexander*, 130 N.C. App. 435, 502 S.E.2d 897 (1998). Since 1999, the State has been the sole shareholder of the NCRR's voting common stock.

16.    Since the 1997 buyout, the State has appointed all directors of the NCRR. 1997 N.C. Sess. Laws 443; 1999 N.C. Sess. Laws 431; N.C.G.S. § 124-15. By statute, the NCRR is required to provide to the General Assembly certain financial information every year as well as a comprehensive strategic plan and a capital

investment plan. N.C.G.S. §§ 124-3, 124-16, 124-17; *see also* JA–0013–26 (2013 strategic plan presentation), 0031–36 (2014 annual report to the General Assembly). In 2013, the General Assembly passed legislation requiring the NCRR to make a "One-Time Cash Dividend" payment to the State as shareholder as well as an annual dividend payment of 25% of the income received by the NCRR from trackage rights agreements. 2013 N.C. Sess. Laws 360.

17. The NCRR possesses the power of eminent domain for any purpose that a private railroad company can exercise. N.C.G.S. § 124-12(2); *see also* N.C.G.S. § 40A-3(a)(4) (discussing the power of railroad corporations as private condemnors). The NCRR also possesses the statutory power to "lease, license, or improve its right-of-way and property." N.C.G.S. § 124-12(1). "Nothing [in the statutory provisions governing the NCRR] repeals or modifies any State-owned railroad company charter or limits the rights of shareholders of the company as provided in Chapter 55 of the General Statutes." N.C.G.S. § 124-13.

## C. Current Operations of the NCRR and Relations with the State

18. The NCRR's mission is: "[t]o put the unique assets of the NCRR to work for the people of the state." (JA–0218.) The NCRR's principal assets consist of real property on which railroad tracks are constructed from Charlotte to Morehead City, representing approximately 317 miles of trackage. (Compl. ¶ 4; Answer ¶ 4.) Today, the NCRR does not operate its own rail services but leases its right of way to Norfolk Southern. (JA–1035.) In addition to the right of way, the NCRR engages in economic development projects around North Carolina. (JA–0844.) These investments include

"megasites" along or contiguous to the NCRR's right of way as well as investments that do not connect to the right of way. (JA–0221, 0843–44.) Many of the NCRR's directors noted they focus on operating the NCRR for the public good. (*See* JA–105, 0964, 1023–24.)

19. The NCRR pays franchise taxes to the State of North Carolina. (JA–0894.) It also pays property taxes on the real property it owns in the sixteen counties in which the rail corridor passes through. (JA–0894.) These taxes are paid to the counties themselves, not the State. (JA–0894.) The NCRR, however, may claim an exemption from corporate income tax pursuant to section 115 of the Internal Revenue Code as "essential governmental function income." (JA–0344.) While the NCRR does not pay corporate income tax to the State, the company owns a for-profit subsidiary, N.C. Railroad, Inc., that pays federal and state taxes. (JA–0890, 0894, 0938.)[3] The NCRR retains an independent outside audit firm that conducts a yearly audit of its financial records. (JA–0878.)

20. The NCRR adheres to the corporate form and follows all corporate formalities. (*See* JA–0873, 1033–34.) The NCRR can change its capital structure or organization upon a vote of its Board without any requirement that the State approve these changes. (JA–1064.)

21. Additionally, the NCRR owns property in its own name, (JA–1067, 0911, 0986, 1036), and has the power to dispose of this property without the approval of

---

[3] The record is silent as to the business conducted by this subsidiary entity and its specific relationship with the NCRR.

government officials. (*E.g.*, JA–0078–84.) Real property owned by the NCRR has been subject to condemnation proceedings initiated by the State. (JA–1074.)

22. The NCRR's Board of Directors controls its own budget without requiring approval by the General Assembly or any other governmental entity or agency. (JA–1064, 0263–68.) Like all corporations organized under Chapter 55, the NCRR operates pursuant to its corporate bylaws. (JA–0897.)

23. By statute, the NCRR Board of Directors consists of thirteen members, appointed as follows:

> seven of the members of the Board of Directors shall be appointed by the Governor, three of the members of the Board of Directors shall be appointed by the General Assembly upon the recommendation of the Speaker of the House of Representatives in accordance with G.S. 120-121, and three of the members of the Board of Directors shall be appointed by the General Assembly upon the recommendation of the President Pro Tempore of the Senate in accordance with G.S. 120-121.

N.C.G.S. § 124-15(a). Of the Governor's seven appointments, one is statutorily required to be a member of the Board of Transportation and another one is the Secretary of Commerce or his/her designee. *Id.*

24. In addition to his appointment powers, the Governor has the statutory right to request certain records from the NCRR. N.C.G.S. § 124-17(b).

25. The NCRR maintains a close relationship with the North Carolina Department of Transportation (the "NCDOT"), with NCRR officials regularly meeting to discuss policy and development priorities. (*E.g.*, JA–0002 (NCDOT inviting the then-President of the NCRR to receive an update on passenger service where officials from the NCDOT, Amtrak, the Ports Authority, and Norfolk Southern would be

present).) Staff from both the NCRR and the NCDOT interact with some regularity to discuss ongoing projects. (*E.g.*, JA–1157.) The NCRR also interacts with the North Carolina Department of Commerce on economic development projects. (JA–0964.)

26. Based on the foregoing relationship between the NCRR and the State, there is a lack of certainty in the way issues like the one presented to the Court today— whether the NCRR is subject to the Public Records Act—should be handled. (JA–0448.) The Court attempts in this Order and Opinion to resolve at least one issue affecting the NCRR's status in this State.

### III. LEGAL STANDARD

27. Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law." N.C.G.S. § 1A-1, Rule 56(c). "A 'genuine issue' is one that can be maintained by substantial evidence." *Dobson v. Harris*, 352 N.C. 77, 83, 530 S.E.2d 829, 835 (2000).

28. The moving party bears the burden of showing that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. *Hensley v. Nat'l Freight Transp., Inc.*, 193 N.C. App. 561, 563, 668 S.E.2d 349, 351 (2008). The movant may make the required showing by proving that "an essential element of the opposing party's claim does not exist, cannot be proven at trial, or would be barred by an affirmative defense, or by showing through discovery that the

opposing party cannot produce evidence to support an essential element of her claim." *Dobson*, 352 N.C. at 83, 530 S.E.2d at 835 (citations omitted).

29.     "Once the party seeking summary judgment makes the required showing, the burden shifts to the nonmoving party to produce a forecast of evidence demonstrating specific facts, as opposed to allegations, showing that he can at least establish a prima facie case at trial." *Gaunt v. Pittaway*, 139 N.C. App. 778, 784−85, 534 S.E.2d 660, 664 (2000).  The Court must view the evidence in the light most favorable to the nonmovant.  *Dobson*, 352 N.C. at 83, 530 S.E.2d at 835.  However, the nonmovant "may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.  If [the nonmovant] does not so respond, summary judgment, if appropriate, shall be entered against [the nonmovant]."  N.C.G.S. § 1A-1, Rule 56(e).

30.     In this case, there is no genuine issue as to any material fact, as the parties acknowledged during the August 13, 2020 video conference hearing on the Cross-Motions.  Rather, the question before the Court on the Cross-Motions is whether, as a matter of law, the NCRR is an agency of the State for purposes of the Public Records Act.  This is a question, therefore, that can be decided by this Court on summary judgment.  *See Chatfield v. Wilmington Hous. Fin. & Dev., Inc.*, 166 N.C. App. 703, 706–07, 603 S.E.2d 837, 839 (2004) (concluding that whether an entity is subject to the Public Records Act is a question of law to be decided by the court).

# IV.    ANALYSIS

31.    SELC bases its claim for relief on the Public Records Act, N.C.G.S. §§ 132-1–132-11.  The Act provides that "[e]very custodian of public records shall permit any record in the custodian's custody to be inspected and examined at reasonable times and under reasonable supervision[.]"  *Id.* § 132-6.  The public policy underlying the Act is set out in section 132-1(b) as follows:

> The public records and public information compiled by the agencies of North Carolina government or its subdivisions are the property of the people.  Therefore, it is the policy of this State that the people may obtain copies of their public records and public information free or at minimal cost unless otherwise specifically provided by law.  As used herein, "minimal cost" shall mean the actual cost of reproducing the public record or public information.

*Id.* § 132-1(b).

32.    Public records, for purposes of the Act, are defined as:

> all documents, papers, letters, maps, books, photographs, films, sound recordings, magnetic or other tapes, electronic data-processing records, artifacts, or other documentary material, regardless of physical form or characteristics, made or received pursuant to law or ordinance in connection with the transaction of public business by any agency of North Carolina government or its subdivisions.

*Id.* § 132-1(a).

33.    Under the Act, an "[a]gency of North Carolina government or its subdivisions . . . mean[s] and include[s] every public office, public officer or official (State or local, elected or appointed), institution, board, commission, bureau, council, department, authority, or other unit of government of the State or of any county, . . . or other political subdivision of government."  *Id.*  Section 132-1(b) makes it clear that

public records compiled by State agencies "are the property of the people." *Id.* § 132-1(b).

34. For this reason, any person who is denied access to public records for purposes of inspection and examination may bring an action against the entity withholding the records seeking an order compelling disclosure of the documents. *Id.* § 132-9(a). Actions brought pursuant to section 132-9 "shall be set down for immediate hearing, and subsequent proceedings in such actions shall be accorded priority[.]" *Id.*

35. SELC asks the Court to answer two questions by virtue of bringing the instant lawsuit: (1) whether the NCRR is an agency of the State subject to the Public Records Act; and, if so, (2) whether the specific records requested by SELC fall within the purview of public records. *See News & Observer Pub. Co. v. Wake Cty. Hosp. Sys., Inc.*, 55 N.C. App. 1, 7, 284 S.E.2d 542, 546 (1981) (summarizing that these are the two questions before a court when handling a public records request). The first is the question before the Court on the Cross-Motions. Our Courts have emphasized that the Public Records Act is to be construed liberally. *See, e.g., News & Observer Pub. Co. v. State ex Rel Starling*, 312 N.C. 276, 281 (1984) ("[I]t is clear that the legislature intended to provide that, as a general rule, the public would have liberal access to public records."). In this vein, North Carolina courts have held that the Public Records Act applies not only to traditional public agencies of the State, but to any corporation that is "so intertwined" with the State that it is, in effect, "an agency of

North Carolina government" for purposes of the Public Records Act. *News & Observer Pub. Co.*, 55 N.C. App. at 12, 284 S.E.2d at 549.

36. Specifically, two Court of Appeals cases are central to the Court's determination today: *News & Observer Pub. Co.*, 55 N.C. App. 1, 284 S.E.2d 542, and *Chatfield*, 166 N.C. App. 703, 603 S.E.2d 837. Both cases involved private corporations with substantial relationships with North Carolina government— specifically, counties of this State—and required the Court of Appeals to evaluate the nature of those relationships to determine whether the private corporations in question were agencies of North Carolina government or its subdivisions for purposes of the Act. *News & Observer Pub. Co.*, 55 N.C. App. at 11, 284 S.E.2d at 548; *Chatfield*, 166 N.C. App. at 706–07, 603 S.E.2d at 839.

37. As both cases observed, "the nature of the relationship between a corporate entity and the government is the dispositive factor in determining whether the corporate entity is governed by the Public Records Law." *Chatfield*, 166 N.C. App. at 707–08, 603 S.E.2d at 840 (citing *News & Observer Pub. Co.*, 55 N.C. App. at 11, 284 S.E.2d at 548). As directed by our appellate courts, the trial court is to focus on the level of "supervisory responsibility and control" the government has over the entity. *Id.* at 707, 603 S.E.2d at 840.

38. In *News & Observer*, the Court considered nine factors in ascertaining the degree of supervisory responsibility and control the government had over the Wake County Hospital System, the relevant entity in that case:

> The . . . articles of incorporation provide (1) that upon its dissolution, the [corporation] would transfer its assets to the county; and (2) that all

vacancies on the board of directors would be subject to the [county's] approval. The lease agreement provided (3) that the [corporation] occupy premises owned by the county under a lease for $ 1.00 a year; (4) that the [county] Commissioners review and approve the [corporation]'s annual budget; (5) that the county conduct a supervisory audit of the [corporation]'s books; and (6) that the [corporation] report its charges and rates to the county. The operating agreements also provide (7) that the [corporation] be financed by county bond orders; (8) that revenue collected pursuant to the bond orders be revenue of the county; and (9) that the [corporation] would not change its corporate existence nor amend its articles of incorporation without the county's written consent.

*News & Observer Pub. Co.*, 55 N.C. App. at 11–12, 284 S.E.2d at 548–49.

39.     In addition to these factors, the *News & Observer* court also considered that the Hospital System performed a "public and government function, exercised for a public purpose[.]" *Id.* at 11–12, 284 S.E.2d at 549 (internal quotation marks and citation omitted). Also central to the Court's analysis was that prior to becoming the non-profit corporation known as Wake County Hospital System, it was the Wake County Hospital Authority, which was a government agency by the System's own concession. *Id.* at 4, 12, 284 S.E.2d at 544, 549. The Court noted that the relationship between the System and Wake County was "not a radical change from the relationship between the [Hospital] Authority and the county[,]" and supported a similar conclusion that the Hospital System was "so intertwined with the county that it must be, and is, an agency of North Carolina government or its subdivisions, i.e., Wake County." *Id.* at 12, 284 S.E.2d at 549 (internal quotation marks and citation omitted). The Court therefore held that the Hospital System was subject to the Public Records Act. *Id.*

40. Over twenty years later, the *Chatfield* court considered whether Wilmington Housing Finance and Development, Inc. ("WHFD"), a non-profit corporation like the Wake County Hospital System in *News & Observer*, was an agency of North Carolina government or its subdivisions, and therefore subject to the Public Records Act. *Chatfield*, 166 N.C. App. at 704, 707, 603 S.E.2d at 838, 840. WHFD's bylaws gave the City of Wilmington, New Hanover County, and the Wilmington Housing Authority the authority to each appoint two individuals to WHFD's board of directors, and required that the remaining three directors be appointed by WHFD's board. *Id.* at 705, 603 S.E.2d at 838. Several members of WHFD's board were governmental officials of New Hanover County and the City of Wilmington. *Id.* The bylaws also gave the Wilmington Housing Authority and the City of Wilmington the authority to review the activities and inspect the books and records of WHFD. *Id.* Additionally, WHFD's principal office was located in a building owned by the City of Wilmington. *Id.* The stated purpose of WHFD was to provide funds for the purchase, development, lease, and operation of low and moderate income housing for the City of Wilmington. *Id.* at 704, 708, 603 S.E.2d at 838, 840. The *Chatfield* court was not persuaded that the bylaws, as then-existing, gave New Hanover County and the City of Wilmington enough supervisory control over the entity to make it an agency of the government, and it concluded that "an entity's stated purpose of performing a function that is of use to the general public, without more, is insufficient to make the Public Records Law applicable." *Id.* at 708–09, 603 S.E.2d at 840–41.

41. Notably, the *Chatfield* court recited the same nine factors used by the court in *News & Observer*, but summarily concluded, without further discussion or analysis, that none of the nine factors were present due to structural changes made to the entity. *Id.* at 708, 603 S.E.2d at 840. Notwithstanding the inapplicability of the *News & Observer* factors, the *Chatfield* court noted, by quoting *News & Observer*, that to determine whether a specific corporation is subject to the Public Records Act requires that "each new arrangement . . . be examined anew and in its own context." *Id.* at 707, 603 S.E.2d at 840. This Court interprets the Court of Appeals' holding in *Chatfield* to mean that the *News & Observer* factors are not exhaustive, and some factors—or all of them, as was the case in *Chatfield*—are not always applicable in determining whether a private corporation is an agency of North Carolina government or its subdivisions for purposes of the Act.

42. Not surprisingly, SELC and Defendants have differing opinions on how the Court should apply the decisions of *News & Observer* and *Chatfield* to its determination in this case. SELC argues that many of the factors considered by the Court in *News & Observer* are present in this case, and weigh in favor of a determination that the NCRR is subject to the Public Records Act. (Pl. Br. Supp. MSJ 23–28.) These factors include that: the State selects all of the NCRR's directors; the State approves all substantive amendments to NCRR's Articles of Incorporation; the NCRR must transfer its assets to the State on dissolution; any revenue generated by the NCRR is taxpayer money; the NCRR's books and records are subject to audit by the State; and the Governor exercises considerable control over the NCRR, through

his Board appointments and through communications from his office to both Directors and staff of the NCRR. (Pl. Br. Supp. MSJ 23–27.)

43. Defendants, on the other hand, argue that SELC has oversimplified the relationship between the NCRR and the State in an attempt to draw similarities between the NCRR here and the Hospital System in *News & Observer*. (*See* Defs. Br. Supp. MSJ 17.) At bottom, Defendants argue that the factors that SELC has identified to show the State has significant supervisory control over the NCRR are all consistent with the degree of control any sole shareholder of a private corporation would have. (Defs. Br. Supp. MSJ 4, 19.)

44. From the Court's perspective, the tension in this case comes down to the fact that Plaintiff and Defendants view the relationship between the NCRR and the State from two fundamentally different lenses: where Defendants argue that the State exerts control over the NCRR just as any sole shareholder of a private corporation would, SELC argues that it does not matter *why* the State exerts control over the NCRR, but the *effect* that control has on the way the NCRR operates.

45. In reviewing both *News & Observer* and *Chatfield*, the Court finds that the facts of neither case are substantially similar to the unique situation before the Court today—a private corporation whose sole shareholder is the State of North Carolina; therefore, a comparison of these two cases to the facts of this case is insufficient, on its own, for the Court to decide whether the NCRR is subject to the Public Records Act.

46. Instead, the Court focuses its analysis on an additional factor: legislative intent. Legislative intent is particularly relevant here because, again, the parties' dispute ultimately turns on whether the NCRR is subject to the provisions of the Public Records Act, a statute duly enacted by the General Assembly of North Carolina. As a result, the Court has a responsibility to consider whether the General Assembly intended for the NCRR to be considered a government agency for purposes of the Act. *See In re B.O.A.*, 372 N.C. 372, 380, 831 S.E.2d 305, 311 (2019) ("Legislative intent controls the meaning of a statute." (internal quotation marks and citations omitted)).

47. There are several instances in which the General Assembly has seemingly expressed its intent that the NCRR should not to be considered an agency of the State, as a general matter. In 1997, for example, the General Assembly enacted legislation that allowed the NCRR's Board of Directors to request liability coverage under the State's liability insurance policy for the company's officers, directors, and employees. (JA-1182–83; 1997 N.C. Sess. Laws 443 (codified at N.C.G.S. § 124-6).) In that legislation, the General Assembly expressly declared that such coverage "*shall not be construed as defining the North Carolina Railroad Company as a public body* or as defining its officers, directors, or employees as public officials or employees for *any other purpose.*" (JA-1183 (emphasis added).)[4]

---

[4] The NCRR's Board never requested the liability coverage, and this provision was ultimately removed from the statutory provisions governing the NCRR. *See* 1997 N.C. Sess. Laws 443 (codified at N.C.G.S. § 124-6); 2013 N.C. Sess. Laws 360 (removing the language).

48.    Next, the Court turns to the NCRR's condemnation power, a power bestowed upon it by statute.  SELC argues that the existence of the NCRR's power to condemn property, a power reserved generally for governmental entities, supports the conclusion that the NCRR is a unit of the government.  Although the power of eminent domain is one this Court has indicated is frequently a power utilized by the State and its subdivisions, *see DiCesare v. Charlotte-Mecklenburg Hosp. Auth.*, 2019 NCBC LEXIS 14, at \*17–18 (N.C. Super Ct. Feb. 27, 2019), there are other private companies, such as utility companies, who are granted the power of eminent domain by the Legislature.  *See* N.C.G.S. § 40A-3(a)(4).  In fact, the NCRR derives its condemnation power from N.C.G.S. § 124-12, which gives the NCRR condemnation power "for the purposes specified in G.S. 40A-3(a)(4)."  Section 40A-3(a) expressly applies to "Private Condemnors" and is separately set out from sections 40A-3(b) and (c), which apply to "Public Condemnors."  *Id.* § 40A-3(a)–(c).  The General Assembly's decision to grant the NCRR the power of eminent domain under the private condemnor statute, rather than the public condemnor statutes, further reflects its understanding that the NCRR was a private corporation—not an agency of the State.

49.    Like the power of eminent domain, the NCRR's tax status provides little support for SELC's position.  While the NCRR's income is excluded from taxable gross income under section 115 of the Internal Revenue Code as "essential government function" income, this is an exemption that applies equally to other private utility companies.  And more importantly, the fact that the NCRR has to qualify for an exemption in order for its taxable gross income to be excluded from the Internal

Revenue Code is further indication that the NCRR is not an agency of the State. As Defendants point out in their brief, revenues of government agencies are not subject to federal taxation to begin with and thus do not depend on exemptions for exclusion. (Defs. Br. Supp. MSJ 28–29.)

50. As to the composition of the NCRR's Board of Directors, SELC points out that, by statute, the NCRR's Board must include the Secretary of Commerce (or his/her designee) and a member of the Board of Transportation. N.C.G.S. § 124-15(a). But this statutory provision does not support SELC's contention that the NCRR is an agency of the State. To the contrary, this is evidence that the General Assembly did not intend for the NCRR to be viewed as a governmental body. Indeed, if the NCRR was deemed a government agency, then the appointment of these government officials to the NCRR's Board may be in violation of the North Carolina Constitution's prohibition against the holding of multiple governmental offices by a single individual. *See* N.C. Const. Art. VI, § 9. Construing the NCRR as a non-governmental entity is more consistent with the General Assembly's intent as well as our Constitution.

51. Perhaps most persuasive to the Court's analysis of legislative intent is evidence in the record regarding the General Assembly's enactment of legislation in 2013 directly impacting the NCRR's interaction with the Legislature. This legislation, in relevant part, created additional public reporting requirements for the NCRR. 2013 N.C. Sess. Laws 360. If, in fact, the NCRR was already subject to the Public Records Act, these additional public reporting requirements would be

unnecessary, as this information would have already been subject to public disclosure pursuant to section 132-1, *et seq.*[5]

52.      And notably, this legislation was enacted on the heels of a 2012 evaluation of the NCRR, conducted by the General Assembly's Program Evaluation Division (the "PED"),[6] in which the PED specifically determined that the NCRR was *"not subject to the State's public records law."* (JA-1113 (emphasis added).) Knowing the Program Evaluation Division's interpretation of the NCRR's status, the Legislature could have decided, when enacting 2013 N.C. Sess. Laws 360, to expressly subject the NCRR to the Public Records Act in order to avoid any confusion as to the status of the NCRR.[7]

---

[5] By statute, some of this information reported to the General Assembly may be deemed "confidential information" that is exempt from the Public Records Act. *See* N.C.G.S. § 124-17(b)–(c) ("At the time a State-owned railroad company provides information under this section, it shall indicate whether the information is confidential. . . . Confidential information is exempt from Chapter 132 of the General Statutes and shall not be subject to a request under G.S. 132-6(a)."). Although this exemption could be viewed as providing support for SELC's contention that the NCRR, along with all of its records, is subject to the Public Records Act in the first place, the Court concludes that the better reading of this provision is that the General Assembly was concerned that certain confidential, private company records belonging to the NCRR could become public records upon receipt by the General Assembly and accordingly, it exempted such records from the scope of the Act.

[6] "The [PED] of the Legislative Services Commission is . . . a staff agency of the General Assembly. The purpose of the [PED] is to assist the General Assembly in fulfilling its responsibility to oversee government functions by providing an independent, objective source of information to be used in evaluating whether programs or activities of a State agency, or programs or activities of a non-State entity conducted or provided using State funds, are operated and delivered in the most effective and efficient manner and in accordance with law." N.C.G.S. § 120-36.11(a).

[7] In fact, before the 2013 legislation was enacted, the General Assembly expressly subjected the NCRR to the statute authorizing the PED to evaluate agencies of the State. By statute, the PED is only authorized to evaluate "programs or activities of a State agency, or programs or activities of a non-State entity conducted or provided using State funds." *Id.* Thus, when the General Assembly enacted legislation in 2011 that authorized the PED to evaluate the NCRR, the Generally Assembly was required to define the NCRR as a "State agency" or "agency" for the limited purpose of authorizing PED evaluation. *See* 2011 N.C. Sess. Laws 391, § 52 ("*For the purposes of this evaluation*, the terms 'State agency' or 'agency' as used under Article 7C of Chapter 120 of the General Statutes shall include the North Carolina Railroad Company." (emphasis added)). Without this clear expression by the General

53.     Moreover, by contrast, expressly classifying a railroad company as a public agency for all purposes is an action that has been taken in other jurisdictions regarding the relationship between their railroads and applicable public records law. *Compare* Alaska Stat. § 42.40.010 (stating that the Alaska Railroad is a "public corporation and . . . an instrumentality of the state"), *with* Alaska Stat. § 40.25.220(2) ("'public agency' means a political subdivision, department, institution, board, commission, division, authority, public corporation, council, committee, or other instrumentality of the state or a municipality; *'public agency' includes* the University of Alaska and *the Alaska Railroad Corporation.*") (emphasis added)).   Yet, our Legislature chose not to make this change or clarification to our General Statutes, opting instead to require the NCRR to provide specifically defined categories of information to the Legislature subject to confidentiality restrictions.

54.     The Court also finds persuasive, though not controlling, the Executive Branch's consistent treatment of the NCRR as a private corporation.  The North Carolina Attorney General has explicitly referred to the NCRR as a private company notwithstanding the State exercising corporate control over it.  (JA–1185.)  In an opinion related to the acquisition of an unrelated private entity by a public entity, the

Assembly, the PED would have had no authority to evaluate a private corporation like the NCRR in the first place.  That is because nowhere in our General Statutes has the Legislature expressed that the NCRR is an agency of North Carolina government or its subdivisions for all purposes.  If there was such a statute on point, or more importantly, if the General Assembly had *intended* for the NCRR to always be considered a government agency, then there would have been no need to define the NCRR as an agency for the PED evaluation. Instead, the General Assembly intentionally chose to give the NCRR the status of an agency—but only for the limited purpose of permitting the PED to conduct an evaluation of the NCRR.  The Court cannot ignore this clear expression of legislative intent.

Attorney General opined that the fact that a public entity owned the private corporation did not change the corporation's form or make it a public agency. (JA–1185.) As support for his opinion, the Attorney General specifically referred to the NCRR as an example in which corporate ownership did not equal public status. (JA–1185.)

55.     Additionally, in 2010, the State Ethics Commission, a state agency tasked with enforcing the State Government Ethics Act, *see* N.C.G.S. § 138A-10, voted not to bring the NCRR's Board of Directors under coverage of the Act, (JA–1184). This decision is noteworthy because the State Government Ethics Act regulates the conduct of "State agency officials." N.C.G.S. § 138A-2. Bringing the NCRR within the scope of the State Government Ethics Act would have bolstered SELC's argument that the NCRR is an agency of the State. But that did not happen. Instead, the State Ethics Commission's decision to not extend coverage to the NCRR's Board provides additional support for Defendants' conclusion that the NCRR is not a governmental body.

56.     The Court acknowledges that, in its prior ruling in this case on Defendants' Motion for Judgment on the Pleadings, it noted that the NCRR's corporate charter reference to the entity as a "body politic" could support a finding that the NCRR is an agency of the State. *See S. Envtl. L. Ctr.*, 2019 NCBC LEXIS 60, at *23–25. On further review, the Court cannot say that this terminology is controlling or dispositive. While under recent dictionary definitions the term 'body politic" most readily refers to a sovereign entity or state, *see Body Politic, Black's Law Dictionary*

(10th ed. 2011), the Oxford English Dictionary notes that a "body politic" may be used to refer to a corporation in legal English or "any organized society or association of persons." *Body Politic, Oxford English Dictionary* (2020). This is a more archaic usage of the phrase, and could, in fact, support the Legislature's use of the phrase in the NCRR's 1849 corporate charter.

57. Additionally, looking at the eighty-eight companies that were chartered in the legislative session of 1848, sixty-four of them had charters that used the language "body politic[,]" with little logical difference between those that used the phrase and those that did not. As Defendants point out in their briefing, there were seventeen lodges that were incorporated in the 1848–49 legislative session, and in nine of them, the term "body politic" was used in some form, while the other eight used the term "body corporate." (Defs. Br. Supp. Mot. 33.) Yet, all seventeen entities were virtually identical to each other. It is therefore difficult to ascertain what the Legislature's intent was in using the phrase "body politic" over 170 years ago.

58. Even North Carolina case law from the early 19th century was not consistent in its treatment of the phrase "body politic." *See Buncombe Turnpike Co. v. McCarson*, 18 N.C. 306, 307–308 (1835) ("benefit . . . of all the members of the body politic" used to describe the function of the corporation to which the legislature had transferred "the labor of the citizen"); *Bath v. Boyd*, 23 N.C. 194, 198 (1840) ("body politic" used to describe the municipal corporation of the Town of Bath); *Doe v. Hillsborough*, 18 N.C. 177, 185 (1835) ("[The trustees] are merely trustees of the charity, and the body politic is the real party . . ."); *State v. Rives*, 27 N.C. 297, 306,

308 (1844) (using the term "body politic" to refer to the legal rights of the corporate entity); *Attorney Gen. v. Petersburg & Roanoke R.R. Co.*, 28 N.C. 456, 465–75 (1846) (considering a railroad company had improperly used its powers as a "body politic" and thus was stripped of its corporate veil). Therefore, the use of the term "body politic" in the NCRR's charter is not enough to tip the scales in favor of finding the NCRR a public agency.

59. The Court also notes that bringing the NCRR within the purview of the Public Records Act could have unforeseen consequences for Chapter 55 of our General Statutes. Indeed, the Court is concerned that equating majority, or sole, ownership with degree of supervisory control would, in effect, collapse the NCRR's corporate personhood. As the North Carolina Supreme Court recently made clear in a case involving the corporate attorney-client privilege, "[o]nce a corporate form of ownership is properly established, the corporation is an entity distinct from the shareholder, even a shareholder owning one-hundred percent of the stock." *Glob. Textile All., Inc. v. TDI Worldwide, LLC*, No. 279A19, 2020 N.C. LEXIS 697, at \*2 (Aug. 14, 2020). Our Legislature was also clear that "[n]othing [in the statutory provisions governing the NCRR] repeals or modifies any State-owned railroad company charter or limits the rights of shareholders of the company as provided in Chapter 55 of the General Statutes." N.C.G.S. § 124-13. Yet, in effect, SELC asks this Court to ignore the NCRR's corporate structure on the basis that the company's sole owner—the State of North Carolina, acting through the General Assembly and the Governor—has exerted control over the NCRR. This the Court cannot do.

60.     Regardless of who owns the NCRR, the fact remains that it operates as an independent corporate entity.  Indeed, as Defendants highlight extensively in their brief, the record reflects that members of the NCRR's Board of Directors have legal obligations to look out for the entity's best interests and have taken positions or made decisions that are contrary to the wishes of the State's officials who appoint them to the Board, including the Governor.  (Defs. Br. Supp. Mot. 9–11.)

61.     In 2017, for instance, the Governor's choice for election as Chairman of the Board was not elected Chairman.  (Defs. Br. Supp. Mot. 11.)  Similarly, when the Governor recently requested that the Board cease from engaging in any further real estate transactions until further notice, the Board resisted the Governor's directive and instead voted to continue engaging in such transactions.  (Defs. Br. Supp. Mot. 10–11.)  And finally, SELC has not pointed to any specific instances where a Director has voted on a matter based on direction from the General Assembly, the Governor, or any other State official.  This degree of independence from the State weighs strongly in favor of Defendants' position as to the independent status of the NCRR for purposes of the Public Records Act.

62.     In sum, the Court concludes that if it were the Legislature's intent that the NCRR be subject to the Public Records Act, it could have made that expressly clear in section 124-11, *et seq*., section 132-1*, et seq*., or anywhere else within our General Statutes.  It did not.  Our Public Records Act is a creature of statute.  It is a right afforded to the people of North Carolina by the General Assembly.  At this time, the Legislature—despite numerous statutes dedicated to the NCRR and the Public

Records Act—has chosen not to subject the NCRR to the Act, explicitly or implicitly. For this reason, and the others identified in this Order and Opinion, the Court concludes it is not for the Court to step into this legislative role.

## V.    CONCLUSION

63.    For the foregoing reasons, the Court hereby **DENIES** Plaintiff's Motion for Summary Judgment in its favor, **GRANTS** Defendants' Motion for Summary Judgment in their favor, and finds that the NCRR is not an agency of the State and therefore is not subject to the Public Records Act.

**SO ORDERED**, this the 20th day of August, 2020.[8]

/s/ Michael L. Robinson
Michael L. Robinson
Special Superior Court Judge
for Complex Business Cases

---

[8] This Order and Opinion was originally filed under seal on August 20, 2020.  (ECF No. 80.) This public version of the Order and Opinion is being filed on September 1, 2020.  Because this public version of the Order and Opinion does not contain any substantive changes from the version filed under seal as to constitute an amendment, and to avoid confusion in the event of an appeal, the Court has elected to state the filing date of the public version of the Order and Opinion as August 20, 2020.