IN THE SUPREME COURT OF NORTH CAROLINA

2021-NCSC-84

No. 453A20

Filed 13 August 2021

SOUTHERN ENVIRONMENTAL LAW CENTER

v.

THE NORTH CAROLINA RAILROAD COMPANY, and MICHAEL WALTERS, JACOB F. ALEXANDER III, WILLIAM V. BELL, MARTIN BRACKETT, LIZ CRABILL, WILLIAM H. KINCHELOE, JAMES E. NANCE, JOHN M. PIKE, GEORGE ROUNTREE III, FRANKLIN ROUSE, NINA SZLOSBERG-LANDIS, AND MICHAEL L. WEISEL, in their official capacities as members of the Board of Directors of the North Carolina Railroad Company

Appeal pursuant to N.C.G.S. § 7A-27(a)(2) from an order and opinion entered on 20 August 2020 by Judge Michael L. Robinson, Special Superior Court Judge for Complex Business Cases, in Superior Court, Wake County, after the case was designated a mandatory complex business case by the Chief Justice pursuant to N.C.G.S. § 7A-45.4(b). Heard in the Supreme Court on 19 May 2021.

*Kimberly Hunter, Ramona H. McGee, and Maia Hutt for plaintiff-appellant.*

*James P. Cooney III and Rebecca C. Fleishman for defendant-appellees.*

ERVIN, Justice.

¶ 1 In this case, we are called upon to decide whether defendant North Carolina Railroad Company is an "agency" or "subdivision" of "North Carolina government" for purposes of the Public Records Act, N.C.G.S. § 132-1. In order to resolve this issue, we are required to interpret the pertinent provisions of the Public Records Act, in

light of the totality of the circumstances, in order to determine whether the state government exercises such substantial control over the Railroad that it is necessarily an agency or subdivision of state government. After carefully weighing all of the relevant facts and circumstances, we determine that the Railroad has been an independent, private corporation since it was chartered in 1849 and that, while the State does exert a considerable degree of control over the Railroad, it primarily exercises this authority in its capacity as the Railroad's sole shareholder rather than in its capacity as a sovereign. As a result, we affirm the trial court's order.

## I. Factual and Procedural Background

### A. History and Current Operations of the Railroad

The Railroad, which was chartered by an act of the General Assembly in 1849, An Act to incorporate the North Carolina Rail Road Company, ch. LXXXII, § 1, 1848–1849 N.C. Laws, 138, 139, is the oldest existing North Carolina corporation. Although interest in building a railroad in North Carolina surfaced as early as the 1820's and even though the construction of such a facility was delayed for over twenty years by high construction costs and the fact that "[p]rivate capital was inadequate," "the legislature long refused to tax the public for state aid." Trelease, Allen W., *The North Carolina Railroad, 1849-1871, and the Modernization of North Carolina*, 14 (1991). Throughout this period, the proponents of a railroad argued that the availability of such a facility was critical to the improvement of North Carolina's notoriously poor

internal transportation system and expressed concern that, without a railroad, "North Carolina's ports would continue to languish while her neighbors waxed rich and powerful at her expense" and that the State "would remain what many of her citizens ruefully admitted her to be, a backwater, the Rip Van Winkle State." *Id.*

¶ 3        Although many people opposed the idea of State ownership of a business enterprise, the State's involvement in the development, construction, and operation of a railroad was "the product of state pride and economic necessity." Trelease, Allen W., *The Passive Voice: The State and the North Carolina Railroad, 1849-1871*, 61 The North Carolina Historical Review 174, 175 (1984). In view of the fact that the proposed railroad had an estimated construction cost of three million dollars and the fact that "[n]o one believed that private investors in the state would or could subscribe that much money," railroad advocates believed that "[c]hief reliance would have to be placed on the public sector, primarily the state." *Id.* at 177. On the other hand, railroad critics "demanded most commonly that the state turn over control of the road to its private stockholders, whose enlightened self-interest would quickly maximize earnings and dividends." *Id.* at 175. According to the Railroad, "[t]he working model devised was a public-private entity structured as a private business corporation."

¶ 4        As an initial matter, the State pledged to contribute two million dollars to the cost of building the proposed railroad, with this amount to be paid once private investors had pledged the remaining one million dollars. *Id.* at 177. After

construction of the railroad began, however, it became apparent that the completion of the project would require another one million dollars, with the State ultimately agreeing to provide the needed additional funds for the project. *Id.* at 178.

The Railroad's original charter allowed the Governor to appoint eight of the twelve members of the Railroad's board. *Id.* According to an amended charter that was approved by the board in 1855, the State held three-quarters of the Railroad's stock and an equivalent number of voting shares in corporate elections. *Id.* at 179. However, "[t]he state's power was exercised very lightly." *Id.* at 180. More specifically, "[a]lthough politics played a large role in directorship appointments, it almost never intruded on operational or financial matters," so that, as a general proposition, "[s]tate control was unobtrusive." Trelease, Allen W., *A Southern Railroad at War: The North Carolina Railroad and the Confederacy*, 164 Railroad History 5, 5 (1991).

In 1997, the General Assembly authorized the State to buy out the remaining privately held shares of Railroad stock. An Act to Make Appropriations for Current Operations and for Capital Improvements for State Departments, Institutions, and Agencies, and for Other Purposes [hereinafter 1997 Budget Appropriation], ch. 443 § 32.30, 1997 N.C. Sess. Laws 1344, 1842–44. In 1998, the State loaned the Railroad sixty-one million dollars to complete this stock purchase transaction. The Railroad repaid the principal amount of this loan to the State over a period of five years, during

the first two of which it paid interest on the loan, after which the General Assembly enacted legislation which provided that interest would no longer accrue on the principal balance. As a result of the buyout, the State became the only holder of voting shares in the Railroad by 1998 and became the Railroad's sole shareholder in 2006.

¶ 7 After the approval of the purchase of the remaining privately held shares by the State in 1997, all of the Railroad's directors have been appointed by the State. *Id.* at 1843–44. At present, the Railroad's board consists of thirteen directors, seven of whom are appointed by the Governor, three of whom are appointed by the General Assembly upon the recommendation of the Speaker of the House of Representatives, and three of whom are appointed by the General Assembly upon the recommendation of the President Pro Tempore of the Senate. N.C.G.S. § 124-15(a) (2019). Of the seven gubernatorial appointees, one must be a member of the Board of Transportation and one must be either the Secretary of Commerce or the Secretary's designee. *Id.* The Railroad cannot sell, lease, mortgage, or otherwise encumber its property without board approval. *Id.* § 124-15(b).

¶ 8 Consistently with the requirements of Chapter 55 of the North Carolina General Statutes, the Railroad operates pursuant to a set of corporate bylaws. Although the Governor does appoint a majority of the members of the board, the board does not have to obtain approval from the Governor or any other state official

before taking actions such as establishing a budget or selling property. In 2019, the Governor sent a letter to the Railroad asking to be provided with the information required by N.C.G.S. § 124-17, additional information relating to the actions that had been taken at board meetings, and the contents of trackage rights agreements and requesting that, "as the shareholders' representative," "the Board refrain from engaging in any real estate transactions until further notice." Although the board complied with the Governor's request for information, it "continued to do business in [its] real estate transactions" while "ke[eping the Governor's office] abreast of the negotiations" relating to a specific real estate transaction in which the Governor had expressed interest. All of the members of the Railroad's board testified that they cast independent votes during board meetings and act independently of the will of the Governor or the General Assembly.[1]

¶ 9     At present, the Railroad owns approximately 317 miles of railroad trackage that runs from Charlotte to Morehead City. The Railroad holds this property in its own corporate name and pays property taxes to the sixteen counties through which its tracks run. The Railroad's revenue is derived from a trackage rights agreement

---

[1] At least one board member testified that he had "never–in [his] entire time on the Board . . . gotten directions from" or "been directed to do something by anybody, either legislatively or executive branch," while another testified that no elected official, member or agent of the General Assembly, or representative of the Department of Transportation or the Department of Commerce had ever directed him to vote a certain way during a board meeting.

that it has with Norfolk Southern, a private railroading entity that operates using the Railroad's property. In addition, the Railroad generates revenue through utility encroachment fees, the proceeds from leasing real property, and investment earnings. The Railroad's stated mission is to "develop the railroad's unique assets for the good of the people of North Carolina" "by enabling freight to grow business, expanding rail to move people and investing in North Carolina."

¶ 10 The General Assembly directed the Railroad to pay a one-time dividend of $15,500,000 to the State, in its capacity as the Railroad's sole shareholder, in 2013. An Act to Make Base Budget Appropriations for Current Operations of State Departments, Institutions, and Agencies, and for Other Purposes [hereinafter 2013 Budget Appropriation], S.L. 2013-360, § 34.14(f), 2013 N.C. Sess. Laws 995, 1340. In addition, the 2013 legislation required the Railroad to submit annual reports to the General Assembly that included information concerning its strategic and capital investment plans; its anticipated dividends for the next three fiscal years; and a description of its business and subsidiaries, the markets in which it operates, and the properties that it owns. *Id*. § 34.14(d) at 1339–40.

¶ 11 Although the Railroad pays property taxes to the counties in which it owns property, it does not pay property taxes to the State. The Railroad does, however, pay franchise taxes to the State. In spite of the fact that it files a federal income tax return, it does not pay federal taxes because its revenues qualify as "income derived

from . . . the exercise of any essential governmental function and accruing to a State." 26 U.S.C. § 115. The State University Railroad Company, which is a for-profit subsidiary of the Railroad, pays both federal and state income taxes.

¶ 12 The Railroad works closely with the Department of Transportation and communicates frequently with Department employees concerning transportation-related matters. In the past, the Department of Transportation has made investments using federal and state funds to improve the Railroad's corridor. According to the Railroad, these monies constitute a "capital contribution to the company by the shareholder."

**B. Procedural History**

¶ 13 In 2018, plaintiff Southern Environmental Law Center was one of several organizations advocating for the construction of the Durham-Orange light rail transit project, a 17.7-mile system that would have provided an additional mass transit connection between Durham and Chapel Hill. The proposed light rail project would have utilized facilities adjacent to certain existing railroad trackage and other real property that the Railroad owned in downtown Durham. In 2019, the Railroad and certain other entities declined to sign a cooperative agreement that would have allowed the light rail project to move forward. After the collapse of the proposed cooperative agreement, the project's board voted to cease further efforts toward the completion of the light rail project. On 23 May 2019, SELC, acting in reliance upon

the Public Records Act, submitted a request to defendant Scott M. Saylor, president of the Railroad, seeking to inspect all of the records in the Railroad's possession relating to the light rail project that had been generated on or after 1 January 2018. The Railroad declined to provide the requested records on the grounds that it was not subject to the Public Records Act.

On 1 July 2019, the SELC filed a complaint in the Superior Court, Wake County, against, Mr. Saylor; the Railroad; and Michael Walters, Jacob F. Alexander, III, William V. Bell, Martin Brackett, Liz Crabill, William H. Kincheloe, James E. Nance, John M. Pike, George Rountree, III, Franklin Rouse, Nina Szlosberg-Landis, and Michael L. Weisel, in their official capacities as members of the Railroad's board of directors, in which it requested the entry of an order declaring that the Railroad was an agency of the State of North Carolina for purposes of the Public Records Act, declaring that the records that SELC had requested from the Railroad constituted public records, and ordering the Railroad to make those records available for inspection by SELC. On 2 August 2019, defendants filed a motion seeking the entry of judgment on the pleadings in their favor, which the trial court denied on 11 September 2019.

After the discovery process had been completed, the parties filed cross-motions seeking the entry of summary judgment in their favor, with both parties having acknowledged that an examination of the record did not reveal the issue of any

genuine issue of material fact and that the sole issue before the trial court was "whether, as a matter of law, the [Railroad] is an agency of the State for purposes of the Public Records Act." On 20 August 2020, the trial court entered an order granting summary judgment in favor of defendants.

¶ 16 In reaching this result, the trial court began by describing the establishment and subsequent operations of the Railroad before discussing the decisions of the Court of Appeals in *News & Observer Publ'g. Co. v. Wake Cty. Hosp. Sys., Inc.*, 55 N.C. App. 1, 7 (1981), and *Chatfield v. Wilmington Hous. Fin. and Dev. Inc.*, 166 N.C. App. 703 (2004), both of which addressed the issue of whether certain entities were subject to the Public Records Act. According to the trial court, "the facts of neither case [we]re substantially similar to the unique situation before the court [in this case]—a private corporation whose sole shareholder is the State of North Carolina; therefore, a comparison of these two cases to the facts of this case [was] insufficient" to permit a determination of whether the Railroad was a government agency or subdivision.

¶ 17 After concluding that the ultimate issue that it faced in this case hinged "on whether the [Railroad was] subject to provisions of the Public Records Act, a statute duly enacted by the General Assembly of North Carolina," the trial court reasoned that it "ha[d] a responsibility to consider whether the General Assembly intended for the [Railroad] to be considered a government agency for purposes of the Act." In conducting the required inquiry, the trial court identified "several instances in which

the General Assembly ha[d] seemingly expressed its intent that the [Railroad] should not be considered an agency of the State," such as the fact that N.C.G.S. § 124-12 authorized the Railroad to exercise the power of eminent domain under the statutory provisions related to private condemnors rather than public condemnors. In addition, the trial court pointed out that "the fact that the [Railroad] has to qualify for an exemption in order for its taxable gross income to be excluded from the Internal Revenue Code is further indication that the [Railroad] is not an agency of the State" on the theory that state government agencies "are not subject to federal taxation to begin with." In the same vein, the trial court determined that the fact that the Secretary of Commerce was statutorily required to serve as a member of the Railroad's board provided further evidence that the Railroad was not a government agency in light of the constitutional and statutory provisions that are intended to limit double office-holding.

The trial court further noted that legislation enacted in 2013, which required the Railroad to make an annual report to the General Assembly, provided additional grounds for believing that the General Assembly did not intend for the Railroad to be subject to the Public Records Act. 2013 Budget Appropriation, S.L. 2013-360, § 34.14, 2013 N.C. Sess. Laws at 1138–42. The 2013 legislation rested upon a study completed by the General Assembly's Program Evaluation Division,[2] an independent entity that

_____

[2] N.C.G.S. § 120-36.11 provides that the Program Evaluation Division

conducts research for the General Assembly, which found that the Railroad was "not subject to the State's public records law." After highlighting the Railroad's corporate status, the trial court expressed concern that "equating majority, or sole, ownership with degree of supervisory control would, in effect, collapse the [Railroad]'s corporate personhood" on the theory that a corporation, even one with a single owner, is an entity that is distinct from its shareholders. For that reason, the trial court concluded that the SELC was essentially asking it to ignore the Railroad's corporate structure, an action that the trial court did not believe itself authorized to take. In light of its determinations that the Railroad "operates as an independent corporate entity" and that the General Assembly had failed on multiple occasions to declare the Railroad a public agency, the trial court concluded that, since the Railroad was not an agency of the State, it was not subject to the Public Records Act. The SELC noted an appeal from the trial court's order to this Court.

**C. Parties' Arguments**

---

is established as a staff agency of the General Assembly. The purpose of the [Program Evaluation Division] is to assist the General Assembly in fulfilling its responsibility to oversee government functions by providing an independent, objective source of information to be used in evaluating whether programs or activities of a State agency, or programs or activities of a non-State entity conducted or provided using State funds, are operated and delivered in the most effective and efficient manner and in accordance with law.

¶ 19 In seeking relief from the trial court's order before this Court, the SELC begins by arguing that the Railroad should be deemed to be subject to the Public Records Act on the grounds that it performs important public and government functions, that the State owns one hundred percent of the Railroad's stock, and that the Railroad "was formed to enhance the economic well-being of the State and its citizens as a whole." In discussing the nine factors enumerated by the Court of Appeals in *News & Observer*, 55 N.C. App. at 11, the SELC asserts that, when each of these factors is properly evaluated in light of the record that was developed before the trial court in this case, the resulting analysis "establish[es] the State's substantial degree of supervision and control" over the Railroad. More specifically, the SELC argues that: (1) the State selects all of the Railroad's directors; (2) the State must approve all substantive amendments to the Railroad's articles of incorporation; (3) the State provided the primary source of funding for the initial construction of the Railroad, loaned sixty-one million dollars to the Railroad at the time that the remaining shares of that entity came into State ownership in 1998, and has continued to invest in the Railroad; (4) the Railroad is required to transfer its assets to the State upon dissolution; (5) revenue collected by the Railroad is to be used "for the public good"; (6) the Railroad's records are subject to government audit pursuant to N.C.G.S. § 124-17; (7) the Railroad must make a report concerning its receipts, expenditures, debts, leases, sales, property acquisitions, sales of stock, and more to the State pursuant to

N.C.G.S. § 124-17; (8) the State reviews the Railroad's investment plan and has influence upon the Railroad's annual budget by virtue of the fact that two appointees to positions in the Governor's administration are required to serve on the Railroad's board; and (9) the State has other means to control the Railroad's activities, including the fact that the Governor has the ability to appoint members of the board and the fact that the Railroad's "stated purpose is to serve North Carolina rather than generate profit."

¶ 20    In light of the substantial degree of control that the State exercises over the Railroad, the SELC argues that the trial court's decision that the Railroad was not subject to the Public Records Act conflicts with *News & Observer* and *Chatfield*. In the SELC's view, the fact that the Railroad has a separate corporate existence does not make the Railroad a distinct entity from the State, which is "different from a traditional private shareholder," rendering the Railroad "a unique entity, with unique powers and responsibilities owed to its citizens as a sovereign." According to the SELC, the issue of "why the State exerts control [over the Railroad] is less important than the substance of the control," with the extensive degree of control that the State exercises over the Railroad being sufficient to make the Railroad the functional equivalent of an agency of the State.

¶ 21    The SELC disputes the validity of the trial court's analysis of the relevant legislative intent by arguing that the trial court erroneously examined legislative

materials other than the Public Records Act in the course of determining that the Railroad was not subject to the Public Records Act. According to the SELC, the trial court's determination that the Railroad is not an agency of the State "as a general matter" and "for all purposes" is irrelevant to the issue that is before us in this case on the theory that the trial court should have focused upon the issue of whether the Railroad was an agency of the State for purposes of the Public Records Act rather than whether it was an agency of the State for all purposes. The SELC argues that the Program Evaluation Division's conclusion that the Railroad was "not subject to the State's public records law" was nothing more than an "unconsidered statement by staff in a report prepared decades after the Public Records Act" that "warrants no deference and does not come close to constituting legislative intent," with "[f]ootnotes in legislative research reports [not being] how law is made in North Carolina." Finally, the SELC contends that the people's power to inspect government records under the Public Records Act is derived from the constitutional principle that all governmental power originates "from the people," N.C. Const. art. I § 2, and that the people of North Carolina "shall not be taxed or made subject to the payment of any impost or duty without the consent of themselves or their representatives in the General Assembly, freely given." N.C. Const. art. I § 8. As a result, the SELC argues that the citizens of North Carolina "must have access to records of the railroad company they own."

¶ 22　　　　In seeking to persuade us to uphold the trial court's order, defendants argue that the State does not exercise sufficient control over the Railroad to warrant a finding that the Railroad is a public agency under the factors discussed in *News & Observer* and *Chatfield*. Defendants note that *Chatfield* held that "an entity's stated purpose of performing a function that is of use to the general public, without more, is insufficient to make the Public Records Law applicable," 166 N.C. App. at 709, and that many private organizations, such as non-profit corporations, have been formed for the purpose of benefiting the general public. In defendants' view, the Railroad is not a government agency for purposes of *Chatfield* given that it acts independently of the State and has, on occasion, declined to comply with requests that the board had received from the Governor.

¶ 23　　　　After discussing the nine factors delineated in *News & Observer* for the purpose of determining the degree of control that the government exercises over the Railroad, defendants conclude that a proper analysis of the relevant factors weighs in favor of a determination that the Railroad is a private entity. For example, defendants argue that the only reason that the Railroad's assets would be transferred to the State upon dissolution is that the State is the Railroad's sole shareholder and that any one hundred percent shareholder would be able to name all of the members of the corporation's board. In addition, defendants note that the Railroad owns its real property independently of the State and that the State is required to pay the Railroad

for the right to lease property from it. Similarly, defendants assert that the Railroad is a for-profit corporation that earns its own revenue and distributes dividends to the State at the sole discretion of the board.

¶ 24        According to defendants, the ultimate issue that must be decided in this case is one of statutory interpretation, which means that the General Assembly's intent with respect to whether the Railroad is subject to the Public Records Act should be deemed to be controlling. Defendants contend that the trial court correctly evaluated the impact of the 2013 legislation, which "imposed reporting requirements [on the Railroad] similar to those required of companies whose stock is publicly traded" and evinced the General Assembly's belief that the Railroad was not a government agency. In defendants' view, the Program Evaluation Division's report regarding the Railroad did not constitute an "unconsidered statement" or a "footnote"; instead, defendants contend that this determination was critical to an understanding of the manner in which the 2013 legislation was structured. Defendants express concern that a decision to disregard the Railroad's corporate existence in this case would have broader implications for other for-profit and non-profit corporations in which the State holds interests. In view of the fact that the State "invests as a shareholder in hundreds, if not thousands, of entities, both publicly traded and privately held," defendants caution that a holding that the State's ownership of corporate stock has

the effect of making the entity in question a public agency would render many private and nonprofit institutions entities subject to the Public Records Act.

## II. Legal Analysis

### A. Standard of Review

This Court reviews appeals from trial court summary judgment orders using a de novo standard of review. *JVC Enterprises, LLC v. City of Concord*, 376 N.C. 782, 2021-NCSC-14, ¶ 8 (citing *In re Will of Jones*, 362 N.C. 569, 573 (2008)). Summary judgment is appropriate when "there is no genuine issue as to any material fact" and a "party is entitled to a judgment as a matter of law." N.C.G.S. § 1A-1, Rule 56(c) (2019). As both parties have acknowledged in their briefs, the record in this case does not reveal the existence of a disputed issue of material fact. For that reason, the ultimate issue that has been presented for our consideration in this case is the purely legal question of whether, given the undisputed facts set out in the record, the Railroad is an "agency of North Carolina government or [a] subdivision" of such an agency as defined by the Public Records Act. *See Chatfield*, 166 N.C. App. at 706–07 (holding that summary judgment was appropriate when the facts were not disputed "and the only issues are whether as a matter of law [the entity] is subject to the Public Records Law of North Carolina").

The North Carolina Public Records Act provides that:

> (a) "Public record" or "public records" shall mean all documents, papers, letters, maps, books, photographs,

films, sound recordings, magnetic or other tapes, electronic data-processing records, artifacts, or other documentary material, regardless of physical form or characteristics, made or received pursuant to law or ordinance in connection with the transaction of public business by any agency of North Carolina government or its subdivisions. Agency of North Carolina government or its subdivisions shall mean and include every public office, public officer or official (State or local, elected or appointed), institution, board, commission, bureau, council, department, authority, or other unit of government of the State or of any county, unit, special district or other political subdivision of government.

(b)     The public records and public information compiled by the agencies of North Carolina government or its subdivisions are the property of the people.  Therefore, it is the policy of this State that the people may obtain copies of their public records and public information free or at minimal cost unless otherwise specifically provided by law. . . .

N.C.G.S. § 132-1 (2019).   "When interpreting statutes, our principal goal is to effectuate the purpose of the legislature."  *State v. Jones*, 358 N.C. 473, 477 (2004) (quoting *Liberty Mut. Ins. Co. v. Pennington*, 356 N.C. 571, 574 (2002)) (cleaned up). "Legislative intent controls the meaning of a statute."  *In re B.O.A.*, 372 N.C. 372, 380 (2019) (quoting *Brown v. Flowe*, 349 N.C. 520, 522 (1998)).  "The intent of the General Assembly may be found first from the plain language of the statute, then from the legislative history, the spirit of the act and what the act seeks to accomplish."  *Lenox, Inc. v. Tolson*, 353 N.C. 659, 664 (2001) (quoting *Polaroid Corp. v. Offerman*, 349 N.C. 290, 297 (1998)) (cleaned up).

¶ 27     Although the issue of whether a particular entity is "an agency" or "subdivision" of state government for purposes of the Public Records Act is a question of first impression for this Court, the Court of Appeals has previously addressed this issue on two prior occasions. In *News & Observer*, 55 N.C. App. at 7, the Court of Appeals considered the extent to which the Wake County Public Health System was an "agency of North Carolina government" for purposes of the Public Records Act. According to the Court of Appeals, "[t]he critical determination" that had to be made in deciding whether the Public Health System was a government agency was whether its " 'independent authority' so overshadows the county's supervisory responsibilities that it forecloses a conclusion that the System is an 'agency of North Carolina government or its subdivisions.' " *Id.* at 9. In holding that the Public Health System was subject to the Public Records Act, the Court of Appeals "look[ed] at the nature of the relationship between the System and the county" government and found that the county's "supervisory responsibilities and control over the System [were] manifest." *Id.* at 11. In the course of its analysis, the Court of Appeals identified the following facts as indicative of the substantial degree of control that the county government exercised over the Public Health System:

> (1) that upon its dissolution, the System would transfer its assets to the county; and (2) that all vacancies on the board of directors would be subject to the Commissioners' approval[;] (3) that the System occup[ies] premises owned by the county under a lease for $ 1.00 a year; (4) that the Commissioners review and approve the System's annual

budget; (5) that the county conduct[s] a supervisory audit of the System's books; and (6) that the System report[s] its charges and rates to the county[;] (7) that the System be financed by county bond orders; (8) that revenue collected pursuant to the bond orders be revenue of the county; and (9) that the System would not change its corporate existence nor amend its articles of incorporation without the county's written consent.

*Id*. In the Court of Appeals' view, the county continued to exercise substantial control over the Public Health System, the Public Health System performed important public functions, and, before the Public Health System had assumed corporate status, it had conceded that it was an agency of the state and had "undergone little more than a change of name through incorporation." *Id*. at 12. As a result, the Court of Appeals found that the Public Health System was a governmental agency subject to the Public Records Act.

¶ 28    In *Chatfield*, 166 N.C. App. at 704, the Court of Appeals was called upon to decide whether an entity which had been formed by the Wilmington Housing Authority and the City of Wilmington as a nonprofit corporation and the charter of which had been modified to make it more independent of the Housing Authority and the City, was subject to the Public Records Act. At the beginning of its analysis, the Court of Appeals noted that "each new arrangement must be examined anew and in its own context" and that the "nature of the relationship between a corporate entity and the government is the dispositive factor in determining whether the corporate entity is governed by the Public Records Law." *Id*. at 707–08 (quoting *News &*

*Observer*, 55 N.C. App. at 11). After holding that, "[p]ursuant to this Court's decision in *News & Observer*, the government must exercise 'supervisory responsibilities and control' over a corporate entity for such an entity to qualify as a government agency and fall within the ambit of the Public Records Law," the Court of Appeals found that none of the nine factors indicating substantial government control upon which it had relied in *News & Observer* were present in *Chatfield*, with "an entity's stated purpose of performing a function that is of use to the general public, without more, [being] insufficient to make the Public Records Law applicable." *Id.* at 709.

¶ 29 Although we believe that both *News & Observer* and *Chatfield* were correctly decided and that the analytical approach that was utilized in those decisions is certainly relevant to the proper resolution of this case, we are not prepared to conclude that the nine factors delineated in *News & Observer* should be treated as outcome-determinative. Instead, we recognize that the Court of Appeals utilized a totality of the circumstances approach in both *News & Observer* and *Chatfield*, pursuant to which it weighed all of the relevant facts and circumstances in order to determine whether the record, when viewed in its entirety, showed that the government exercised such substantial control over the operations of the relevant entity as to render it a governmental agency or subdivision, with "each new arrangement [to] be examined anew and in its own context." *Id.* at 707–08. At the end of the day, however, we must recognize that we are necessarily attempting to

determine whether the relevant facts do or do not satisfy a statutory standard, a fact that, ultimately, makes the inquiry in which we are required to engage in this case, in large part, one of statutory construction. After conducting the required totality of the circumstances evaluation, we hold that the Railroad is not an agency or subdivision of government that is subject to the requirements of the Public Records Act.

**B. Legislation involving the North Carolina Railroad Company**

¶ 30        In examining past laws, decisions, and governmental opinions relating to the Railroad, we conclude that, in addition to the fact that the General Assembly has had multiple opportunities to define the Railroad as a governmental agency without having done so, various components of state government have acted on numerous occasions in such a manner as to suggest their belief that the Railroad is a private corporate entity rather than a governmental agency or subdivision. While these determinations do not, of course, control the outcome in this case, they are, when taken in conjunction with our evaluation of the relevant facts and circumstances outlined in *News & Observer* and *Chatfield*, sufficient to persuade us that the Railroad is not a governmental agency or subdivision for purposes of the Public Records Act.

¶ 31        As we have already noted, the General Assembly enacted new reporting requirements applicable to the Railroad in the 2013 Budget Appropriation, S.L. 2013-

360, § 34.14(d), 2013 N.C. Sess. Laws at 1139–40 (codified at N.C.G.S. § 124-17), pursuant to which the Railroad was required to "submit an annual report" to the General Assembly that included the Railroad's strategic and capital investment plans, the dividends that the Railroad anticipated paying during the next three fiscal years, a list of the properties owned by the Railroad, and a list of the Railroad's officers and directors, among other things. N.C.G.S. § 124-17(a). The enactment of the 2013 legislation followed a comprehensive study of the Railroad conducted by the Program Evaluation Division. In the legislation commissioning the Program Evaluation Division's study of the Railroad, An Act to Make Technical, Clarifying, and Other Modifications to the Current Operations and Capital Improvements Appropriations Act [hereinafter 2011 Technical Corrections Act], S.L. 2011-391, § 52, 2011 N.C. Sess. Law 1557, 1584–85, the General Assembly noted that, for the purposes of the study, "the terms 'State agency' or 'agency' as used under Article 7C of Chapter 120 of the General Statutes shall include the North Carolina Railroad Company." The inclusion of this language tends to suggest a recognition on the part of the General Assembly that the Railroad was not a state agency, given that the Program Evaluation Division is tasked with "evaluating whether programs or activities of a State agency, or programs or activities of a non-State entity conducted or provided using State funds" are being operated efficiently and in accordance with law. N.C.G.S. § 120-36.11 (2019). Since the Railroad is not a "State agency" and is

not operated "using State funds," it was necessary for the General Assembly to define the Railroad as a state agency in the 2011 Technical Correction Act, S.L. 2011-391, § 52, 2011 N.C. Sess. Law at 1585, to give it the authority to conduct the required evaluation. This language would have been unnecessary in the event that the Railroad was already considered a state agency.

¶ 32 On the first page of the study that it performed pursuant to the requirements of the 2011 legislation, the Program Evaluation Division noted that the "State ha[d] limited mechanisms for oversight" of the Railroad given the Railroad's status as "a private corporation" and that the Railroad was subject to "less stringent reporting requirements than publicly-traded corporations." For that reason, the Program Evaluation Division suggested that the General Assembly "amend Chapter 124 of the General Statutes to strengthen reporting" requirements applicable to the Railroad. In support of its recommendations, the Program Evaluation Division stated that the

> State of North Carolina is the sole shareholder of the [Railroad], but it remains a private corporation. . . . As a private corporation, [the Railroad] files with the U.S. Internal Revenue Service as a C corporation and is subject to Chapter 55 of the General Statutes. Because [the Railroad] is not part of state government, several state laws do not apply to the corporation.
>
> - [Railroad] employees are not state employees under the State Personnel Act.
> - [The Railroad's] Board of Directors is not a covered board under the State Government Ethics Act.
> - [The Railroad] is not subject to the State's public records law.

- [The Railroad] is not reviewed as a part of the state budget process because it does not receive state appropriations.

Although the Program Evaluation Division acknowledged that the General Assembly had the authority to transform the Railroad into an entity of state government by repealing the Railroad's corporate charter and dissolving the corporation, it cautioned that acting in such a manner "would be a lengthy and complicated process" that had "several legal and financial implications," including the risk that the State would become responsible for the Railroad's financial obligations and the fact that the State would lose the income that was currently being derived from the Railroad's franchise tax payments. As a result, the Program Evaluation Division did not advise the General Assembly to convert the Railroad into a state agency and, instead, recommended that the General Assembly enact legislation strengthening the reporting requirements to which the Railroad was subject and requiring the Railroad to pay a dividend to the State.

¶ 33       According to the SELC, the trial court placed "undue reliance on a footnote in a report written by the [Program Evaluation Division]—unelected staff tasked with completing research, not drafting law," in reaching the conclusion that the Railroad was not subject to the Public Records Act. Although the SELC is certainly correct in pointing out the non-binding nature of the Program Evaluation Division's comment, the record also reflects that the General Assembly enacted legislation during the 2013

session that imposed additional reporting requirements upon the Railroad and required the Railroad to make a specific dividend payment. Although the General Assembly did not, to be sure, include any sort of explicit endorsement of the Program Evaluation Division's position with respect to the issue of whether the Railroad was subject to the Public Records Act in the 2013 legislation, the General Assembly's decision to adopt the Division's ultimate recommendations does tend to suggest that it agreed with the logic that undergirded those recommendations.

In addition, the General Assembly stated in the 2013 legislation that:

> (b)     Upon the request of the Governor or any committee of the General Assembly, [the Railroad] shall provide all additional information and data within its possession or ascertainable from its records. . . .   At the time [the Railroad] provides information under this section, it shall indicate   whether   the   information   is   confidential. Confidential information shall be subject to subsection (c) of this section.
>
> (c)     Confidential information includes (i) information related to a proposed specific business transaction where inspection, examination, or copying of the records would frustrate the purpose for which the records were created, or (ii) information that is subject to confidentiality obligations of [the Railroad].   Confidential information is exempt from Chapter 132 of the General Statutes and shall not be subject to a request under G.S. 132-6(a).

N.C.G.S. at § 124-17(b), (c). A careful reading of N.C.G.S. § 124-17 suggests that, consistently with the approach adopted by the Program Evaluation Division, the General Assembly did not consider the Railroad to be a governmental agency or

subdivision that was subject to the Public Records Act. Simply put, there would have been no need for the enactment of subsection (b), which requires the Railroad to provide the information that had to be submitted to the Governor or the General Assembly without in any way limiting such requests to confidential information, in the event that the Railroad was already subject to the provisions of the Public Records Act. A similar deduction can be made from the fact that, in subsection (c), the General Assembly adopted a confidentiality provision applicable to information that it received from the Railroad that would have been unnecessary in the event that the Public Records Act directly applied to the Railroad. As a result, we find it difficult to reach any conclusion other than that the General Assembly agreed with the Program Evaluation Division that the Railroad was not, under existing North Carolina law, an agency or subdivision of State government that is obligated to comply with the Public Records Act.

¶ 35         Although the history surrounding the language contained in the 2013 legislation provides the strongest indication of the General Assembly's belief that the Railroad is not a governmental agency or subdivision subject to the Public Records Act, the language of other statutory provisions points in a similar direction. For example, in 1997, the General Assembly enacted legislation permitting the members of the Railroad's board to request coverage under the State's officers, directors, and employees' liability policy while specifying that "[c]overage of the officers, directors,

and employees of the [Railroad] under this subsection shall not be construed as defining the [Railroad] as a public body or defining its officers, directors, or employees as public officials." 1997 Budget Appropriation, ch. 443, § 32.30, 1997 N.C. Sess. Laws at 1844. In 2000, the General Assembly passed An Act to Implement the Recommendations of the Future of the North Carolina Railroad Study Commission, S.L. 2000-146, 1999 N.C. Sess. Laws 869, 872, which gave the Railroad "the power of eminent domain to acquire property in fee simple for the purposes specified in G.S. 40A-3(a)(4)," which affords eminent domain authority to private, rather than public, condemnors. N.C.G.S. § 124-12. As a result, other relevant statutory provisions enacted by the General Assembly consistently suggest that the Railroad is not a governmental agency or subdivision subject to the Public Records Act.

¶ 36    The Attorney General has suggested that the Railroad is not subject to the Public Records Act as well. In a 2000 opinion, the Attorney General stated that the "North Carolina Constitution [ ] sanctions the appropriation of public money to a private corporation for the accomplishment of a public purpose," citing N.C. Const. art. V, § 2(7). After noting that "the 1997 General Assembly authorized the investment of Sixty-One Million Dollars ($61,000,000) in order to acquire the outstanding private shares, and thereby total control, of the [Railroad]," the Attorney General opined that the State also had the authority to acquire control over a healthcare corporation without rendering that corporation an agency of the State,

described the Railroad as an example of a private corporation in which the State is nothing more than a shareholder, and stated that "it is clear that the System's acquisition of corporate control over a nonprofit corporation does not alter the legal status of the corporation or vest within it attributes of the State of North Carolina." Letter from Grayson G. Kelley, Senior Deputy Attorney General, to Representative Daniel T. Blue, *Proposed Acquisition of Rex Healthcare by the University of North Carolina Health Care System* (Mar. 8, 2000) (available at https://ncdoj.gov/opinions/proposed-acquisition-of-rex-healthcare-by-the-university-of-north-carolina-health-care-system/).

¶ 37        Similarly, according to materials provided to the trial court in this case, the State Ethics Commission voted in 2010 that the Railroad's directors were not subject to the provisions of the State Government Ethics Act, Chapter 138A of the General Statutes.[3]  In seeking a determination that the Railroad was not a state agency subject to the provisions of the State Ethics Act, the Railroad contended, by means of a letter drafted by private counsel,[4] that the "fact that the State is the sole-shareholder . . . does not change the private corporate status" of the Railroad, with

---

[3] The State Government Ethics Act is intended to "ensure that elected and appointed State agency officials exercise their authority honestly and fairly, free from impropriety, threats, favoritism, and undue influence," with the Act serving to establish a code of ethical conduct "for elected and appointed state agency officials."  N.C.G.S. § 138A-2 (2019).

[4] We further note that the Railroad is not represented by the Department of Justice in this case and has, instead, conducted its defense using privately retained counsel, a fact that further tends to show that the Railroad is not a governmental agency or subdivision.

there being multiple grounds for concluding that the Railroad was not an agency of state government, including the fact that the Railroad did not have the eminent domain authority available to public condemnors, that the Railroad paid property taxes to the sixteen counties in which it owned property, that the Railroad did not have the benefit of sovereign immunity, and that the Railroad's employees were not state employees. In light of these and similar factors, the Commission concluded that the Railroad was a "unique agency," that it "presented special issues not previously considered by the Commission," and that it should not be deemed to be a state agency subject to the State Ethics Act. As a result, certain relevant statutory provisions and the decisions of the Attorney General and the State Ethics Commission, which clearly constitute persuasive authority that sheds light on the question that is before us in this case, suggest, if they do not explicitly state, that the Railroad is not a governmental agency or subdivision subject to the Public Records Act.

## C. Presence of "Substantial Government Control"

¶ 38        The legislative enactments and other official determinations outlined above are consistent with our understanding of the information contained in the record concerning the extent to which the State, acting in a governmental capacity, exercises sufficient supervision and control over the Railroad to make it a state agency or subdivision. Admittedly, the Railroad has enjoyed and continues to enjoy a number of benefits from its relationship with the State. For example, the State provided

three-quarters of the Railroad's initial capital and loaned the Railroad the funds that it used to complete the purchase of its remaining shares. In addition, the General Assembly allowed the Railroad to forego the payment of interest on the principal balance of this loan during the final three years of the repayment period. Finally, the Railroad benefits from the use of state and federal funds in making safety and service-related improvements to the corridor that the Railroad owns and the fact that it is not required to pay state and federal income taxes. As a result, a number of factors would tend to support a determination that the Railroad is a governmental agency or subdivision.

¶ 39        However, we believe that a number of countervailing factors arising from the Railroad's status as a separate corporate entity outweigh the factors that favor classifying the Railroad as a governmental agency or subdivision. Among other things, the undisputed record evidence reflects that the Railroad has consistently maintained its separate corporate identity and structure and makes decisions independently of any directives that it might receive from governmental officials, including the Governor. For example, the Railroad adopts and funds its own budget without the necessity for prior approval from any governmental entity. In addition, the Railroad, rather than the State, owns title to its own property and exercises eminent domain authority as a private, rather than a public, condemnor. The revenues that the Railroad uses to support its operations are titled to the Railroad

rather than the State; are derived from the Railroad's trackage right agreements, utility encroachment agreements, real estate leases, and investment earnings rather than from the appropriation of state funds; and are spent, as a general proposition, in a manner controlled by the board rather than the Governor, the General Assembly, or any other agency of State government. Although the Railroad does, and has even been ordered, on one occasion, to pay dividends to the State, those dividend payments are, for the most part, made at the behest of and in an amount determined by the board. The revenues earned by the Railroad are reinvested into the company, whether through dividends that are received by the State and reinvested in the company's infrastructure, or as directed by the board. Similarly, the Railroad pays local property taxes to the counties in which it owns property and a franchise tax to the State and claims an exemption from federal income taxation on the basis of a statutory provision that would be irrelevant in the event that the Railroad was a governmental agency. Although the Railroad does, on occasion, engage in planning-related activities with governmental agencies, the same can be said of other private entities as well. As a result, the manner in which the Railroad operates much more closely resembles the activities of a private corporation rather than those of a governmental agency or subdivision.

¶ 40        In seeking to persuade us to reach a different result, the SELC emphasizes the fact that the State is the Railroad's sole shareholder, that the members of the board

are chosen by the Governor and the General Assembly, that certain members of the board must be members of the Governor's administration, that the Railroad's property must be transferred to the State upon dissolution, that the State must approve fundamental changes to the Railroad's corporate documents, that the Railroad is entitled to favorable tax treatment in some instances, and that the General Assembly has exercised authority over the Railroad for the purpose of requiring the provision of certain information and the making of certain dividend payments.[5]  Although the State, in its capacity as the Railroad's sole shareholder, does have a certain degree of indirect control of the entity's day-to-day operations and has the right to approve or disapprove certain fundamental corporate decisions, those facts, standing alone, do not serve to make the Railroad a state agency or subdivision and exist in all situations in which the corporation is owned by a single stockholder. The same is true of the fact that the Railroad was organized and continues to operate for the benefit of the public rather than for purely profit-seeking purposes, with a similar statement being applicable to many nonprofit corporations in which the State has no interest.  Simply put, most of the information upon which the SELC relies in

---

[5] In view of the fact that many of the indicia of control upon which the SELC relies stem from the fact that the State is the Railroad's sole shareholder, any effort to cumulate both the fact that the State is the Railroad's sole shareholder and the fact that the State's status as the Railroad's sole shareholder gives it the right to make certain decisions relating to the Railroad, such as the election of the members of the Railroad's board, seems to us to result in the placing of impermissible weight upon those more specific factors in the required totality of the circumstances analysis.

seeking to persuade us that the Railroad should be deemed subject to the Public Records Act is the direct result of the State's status as the Railroad's sole shareholder rather than the exercise of the State's sovereign authority.

¶ 41 Although the SELC argues that the nature of the State's authority over the Railroad, rather than the source of that authority, should be deemed controlling, we do not find this argument persuasive. The SELC's argument to the contrary notwithstanding, the basis of the State's influence over the Railroad is critical to the proper resolution of the issue of whether the Railroad is a governmental agency or subdivision for purposes of the Public Records Act. The fundamental difference between a governmental entity and a private one is the extent, if any, to which the entity in question exercises the sovereign authority of the State. As a result, it stands to reason that the extent to which the State exercises sovereign authority, rather than authority derived from some other source, should be an important feature of any determination concerning the applicability of the Public Records Act.

¶ 42 The SELC's suggestion that we should overlook the nature and source of the State's authority over the Railroad is inconsistent with this Court's jurisprudence for a second reason as well. Although the Railroad's separate corporate existence does not, of course, control the outcome of this case, we have consistently, throughout our history, been disinclined to disregard the distinction between a corporation and its shareholders. For that reason, we have recently stated, in a different context, that,

"[o]nce a corporate form of ownership is properly established, the corporation is an entity distinct from the shareholder, even a shareholder owning one-hundred percent of the stock." *Glob. Textile All., Inc. v. TDI Worldwide, LLC*, 375 N.C. 72, 74 (2020). Nothing in the present record tends to suggest that the Railroad has failed to take the steps necessary to maintain its separate corporate identity or to operate in a fashion that exhibits a degree of independence from direct governmental control, a fact that further persuades us to refrain from holding that the mere fact that the State has certain authority over the Railroad by virtue of its status as the Railroad's sole shareholder and the fact that the Railroad was organized and operates for the benefit of the public suffices to make the Railroad a governmental agency or subdivision subject to the provisions of the Public Records Act.[6]

Thus, given that both the General Assembly and other governmental entities have consistently treated the Railroad as a private corporation rather than a public agency or subdivision and given that the State, acting in its capacity as sovereign,

---

[6] The SELC's suggestion that the trial court erred by examining whether the Railroad was a governmental agency or subdivision in general, rather than whether it was a governmental agency or subdivision for purposes of the Public Records Act, does not strike us as persuasive given that nothing in the relevant statutory language suggests that there is any difference between a governmental agency or subdivision, in general, and a governmental agency or subdivision for purposes of the Public Records Act. Instead, the relevant statutory language simply speaks of an "agency" or "subdivision" of State government. In the same vein, any argument that the Public Records Act requires an expansive interpretation of what is and is not a "public agency" or "subdivision" assumes the answer to the point at issue given that the relevant statutory language invariably refers to covered agencies or officers as "public" without further elaboration.

does not have a sufficient degree of control over the day-to-day operations of the Railroad, we hold that the trial court did not err by granting summary judgment in defendants' favor in this case. As a result, the trial court's order is affirmed.

AFFIRMED.

Justice EARLS dissenting.

This case presents a single question: can a corporate entity, wholly owned by the State of North Carolina, directed by a board whose members are appointed by State elected officials, wielding the power of eminent domain, and comprised of assets that will escheat to the State in the event of dissolution, evade public scrutiny under the Public Records Act (the Act)? The majority says yes. Because this holding runs contrary to the purpose of the Act and privileges the form of the corporation over the public nature of its governance and activities, I respectfully dissent.

## I.    Background

The North Carolina Railroad Company (NCRR) was created by statute in 1849. An Act to incorporate the North Carolina Rail Road Company, ch. LXXXII, § 1, 1848–1849 N.C. Laws, 138. The State paid $2 million to be NCRR's majority shareholder at that time, *Id.* § 36, came to own more of NCRR's stock through transactions in the ensuing decades, and by 2006 owned *all* NCRR stock. Today, through its officials, the State chooses NCRR's directors (N.C.G.S. § 124-15 (2019)), approves all substantive changes to NCRR's articles of incorporation, facilitates financing for NCRR, receives reports of NCRR rates and rate changes (N.C.G.S. § 124-17), assumes control of revenue it collects, and stands to receive the assets of NCRR in the event of dissolution.

In 2019, the Southern Environmental Law Center (SELC) wrote to NCRR to request records related to NCRR's involvement in a light rail project. SELC believed

NCRR would be compelled to provide the records under the Public Records Act. NCRR denied the request and sent no records, claiming it was not subject to the Act. SELC filed suit to compel production of the records. After a hearing, the North Carolina Business Court granted NCRR's motion for summary judgment, concluding "that if it were the Legislature's intent that [NCRR] be subject to the Public Records Act, [the Legislature] could have made that expressly clear . . . ." Today's majority affirms the Business Court's decision, holding that although the State has exercised a "considerable degree" of authority over NCRR in the past 170 years, it has done so as NCRR's "sole shareholder rather than in its capacity as a sovereign." But the majority's decision ignores the legislative intent of the Public Records Act, the scope of the statutes governing NCRR's activities, and the realities of NCRR's relationship with the government of North Carolina.

¶ 47    Today's decision runs contrary to precedent and threatens the vitality of the Public Records Act. It allows a corporate entity—fully owned by the State and operationally intertwined with numerous government officials and agencies—to shield from public scrutiny its records made in connection with the transaction of public business. It also risks allowing the State to sidestep the requirements of the Public Records Act by conducting its business through a nominally private entity. It is the substance of an entity's actions or operations, not its particular form, which dictates whether the public has right to access its records. Accordingly, I would hold

that NCRR is a government agency subject to the Public Records Act. I respectfully dissent.

## II. Analysis

¶ 48 Enacted in 1975, the North Carolina Public Records Act provides that "[t]he public records and public information compiled by the agencies of North Carolina government or its subdivisions are the property of the people." N.C.G.S. § 132-1(b) (2019). A "public record" is defined to include documents "made or received pursuant to law or ordinance in connection with the transaction of public business by any agency of North Carolina government or its subdivisions." N.C.G.S. § 132-1(a). The Act further defines "agency of North Carolina government or its subdivisions" broadly to include "every public office, public officer or official (State or local, elected or appointed), institution, board, commission, bureau, council, department, authority or other unit of government of the State or of any county, unit, special district or other political subdivision of government." *Id.* The question we must answer—and where I differ from the majority—is whether the phrase "agency of North Carolina government or its subdivisions" includes NCRR for the purposes of the Public Records Act.

### A. NCRR's operations are sufficiently intertwined with those of North Carolina's government to subject it to the Public Records Act

¶ 49 Forty years ago, the Court of Appeals concluded that the Wake County Hospital System, organized as a nonprofit corporation, was a government agency

within the meaning of the Public Records Act because it "exercise[d] its 'independent authority' so intertwined with the [government] that it must be, and is, an 'agency of North Carolina government or its subdivisions.' " *News & Observer Pub. Co. v. Wake Cty. Hosp. Sys., Inc.*, 55 N.C. App. 1, 12 (1981), *disc. rev. denied*, 305 N.C. 302 (1982). Since the Court of Appeals decided *Wake County Hospital System*, it has been the undisturbed law of our state that a formally corporate entity may be considered a government agency for the purposes of the Act depending upon "the nature of the relationship between the [entity] and the [government]." *Id.* at 11. Given the legislature's intent in passing the Public Records Act, this rule makes good sense— the purpose of the Act is to ensure that the people of North Carolina have the information they need to hold the government accountable to the citizens it serves.

¶ 50        A corporation's public-serving actions do not, on their own, subject the corporation to the Act. *See Chatfield v. Wilmington Hous. Fin. and Dev. Inc.,* 166 N.C. App. 703, 709 (2004) ("[A]n entity's stated purpose of performing a function that is of use to the general public, without more, is insufficient to make the [Act] applicable."). Rather, it is the "substance and not the form of the [corporation] that is the key" to our evaluation. *Wake Cty. Hosp. Sys., Inc.*, 55 N.C. App. at 10. The substance of the corporation is often revealed by the extent to which the government exercises "supervisory responsibilities and control" over the entity. *See Chatfield,* 166 N.C. App. at 707. Put simply, a corporation can be "so intertwined" with the government that it

is "an agency of North Carolina" for the purposes of the Act. *Wake Cty. Hosp. Sys., Inc.*, 55 N.C. App. at 12. But critically, it is possible that such a corporate entity, intertwined with the State, can be considered a public agency for the purposes of the Act without being treated as a state agency for all purposes. *See id.* at 7-8. The majority errs by collapsing this distinction.

¶ 51        In *Wake County Hospital System,* the Court of Appeals cited several specific aspects of the relationship between the hospital system and the county that demonstrated the government and the hospital system were substantially "intertwined." They are of the categories that are essential to the operation of a corporate entity, including, but not limited to, financing, asset management, operations, and decision-making and control. *Id.* at 11. But as the court also noted, these aspects are not factors or elements that can be applied in each circumstance— "each new arrangement must be examined anew and in its own context." *Id.*

¶ 52        Indeed, "examin[ing]" the relationship between NCRR and the State of North Carolina "anew and in its own context" reveals that the state's "responsibilities and control" over NCRR are "manifest." *Wake Cty. Hosp. Sys., Inc.*, 55 N.C. App. at 11. A close examination of the relationship supports only the conclusion that NCRR must be a state agency for the purposes of the Act. The State selects every Director of NCRR, N.C.G.S. § 124-15, and those Directors perform State-mandated obligations. N.C. Exec. Order No. 2009-034 (Dec. 9, 2009). Two of the thirteen Directors must be

members of the Governor's administration, N.C.G.S. § 124-15, serving both NCRR and the administration to ensure effective communication and coordination between the organizations. The State must approve all substantive amendments to NCRR's articles of incorporation. Revenue earned today by NCRR belongs to the State and is treated as revenue for "the public good." In turn, the General Assembly often directs how those revenues are spent once they accrue to the State. *See* An Act to Make Base Budget Appropriations for Current Operations of State Departments, Institutions, and Agencies, and for Other Purposes [hereinafter 2013 Budget Appropriation], S.L. 2013-360, 2013 N.C. Sess. Laws 995. NCRR's finances and records are subject to State review and records requests from State officials, and the results of external audits are provided to the General Assembly. N.C.G.S. § 124-17. Moreover, NCRR is statutorily mandated to annually submit to the General Assembly a detailed financial report concerning its strategy, operations, and personnel. *Id.* NCRR also enjoys powers of eminent domain. N.C.G.S. § 124-12. As the majority notes, that authority is given to NCRR as a private condemnor, not a public one, under N.C.G.S. § 40A-3(a)(4). Yet N.C.G.S. § 40A-3(a) grants the power of eminent domain for "the public use or benefit," another example of NCRR's obligations to the people of North Carolina.

¶ 53        Just like conventional state agencies, NCRR is frequently a partner to departments of state government in planning and decision-making. NCRR often

collaborates on projects with the Department of Transportation (DOT), and staff from both NCRR and DOT discuss those projects routinely. Leaders at the organizations aim to have a "regular exchange of information" between their respective governing boards. NCRR cooperates with DOT to serve as an intermediary between DOT and Norfolk Southern, another railroad company. Elsewhere, directors from the Department of Commerce are regularly updated on NCRR's activities so that, in the words of one such director, "[c]ommerce [can] thrive in North Carolina."

And, as mentioned previously, the State has owned all of NCRR's stock since 2006. NCRR contends that many of its entanglements with the State, like those detailed above, arise from the fact that the State is the sole shareholder of NCRR's stock, and are thus irrelevant. But the State's control of NCRR is essential context. To NCRR, the appointment of its Board members by elected state officials—the Governor and the General Assembly—is "the same . . . as any other private corporation." Legislation mandating the frequency and content of reports is merely a "shareholder agreement." As noted, under current arrangements, were the NCRR to be dissolved as a corporation, its assets would return to the State. NCRR claims that because this is simply one post-dissolution option among many, it should not bear on our analysis But I am unconvinced that what is presently true should be discounted simply because we can imagine other future alternatives. NCRR seeks to hide behind "the fundamental principle of corporate law that a corporation has a legal existence

that is distinct from its shareholders" and accuses SELC of attempting to "merge the identity" of the State with that of the corporation, but this case requires us to examine the substantive relationship between the corporation and the State. We cannot, as the majority does, rely upon the fact of NCRR's "separate corporate identity" or "corporate form." Our inquiry concerns when a corporation is obligated to be transparent about its operations, and we beg the question if we rest on corporate formalities.

¶ 55    The majority notes that we have "consistently . . . been disinclined to disregard the distinction between a corporation and its shareholders." In the majority's view, we may recognize that the State is NCRR's "sole shareholder," possesses "a certain degree of indirect control of the entity's day-to-day operations," and "has the right to approve or disapprove certain fundamental corporate decisions," but "those facts, standing alone, do not serve to make [NCRR] a state agency or subdivision." Yet this gives insufficient weight to the many facts relevant to our inquiry which all point in the direction of treating NCRR as a public entity for the purposes of the Act. When the State owns the corporation, appoints its board, mandates its reporting, spends its revenue, and stands to receive the assets in the event of dissolution, we should recognize the obvious truth that the identity of the corporation and its sole shareholder—the State—are meaningfully intertwined. NCRR's argument—that the activities of this kind of corporation can be hidden from scrutiny by the people of

North Carolina—is a self-interested attempt to cleave its public business from its public responsibilities. Today's decision gives that attempt the force of law. The "manner in which [NCRR] operates," which the majority characterizes vaguely as "resembl[ing] the activities of a private corporation," should not distract us from the manifest conclusion that NCRR and the State are substantially intertwined.

**B. Holding that NCRR is subject to the Public Records Act is consistent with the legislature's intentions toward both NCRR and the Public Records Act**

¶ 56        Contrary to the arguments promoted by NCRR and the majority, the conclusion that NCRR is subject to the Public Records Act is consistent with the intent of the General Assembly. This is true for two reasons.

¶ 57        First, the legislature created NCRR to benefit the State, and it has continued to exercise its authority over NCRR to serve the public. Troubled by the poor condition of the State's transportation system and the limited connections between western North Carolina and the State's eastern seaports, the General Assembly chartered NCRR "[t]o create a railroad company . . . to promote growth in the state." Their efforts were motivated by a belief in "the importance of the railroad to the economic well-being of the State and its citizens as a whole." While it is true, as NCRR repeatedly notes, that the large amount of money required to fund the initial investment in NCRR came from private sources, it is also apparent from the records of the time that the General Assembly intended to link the eastern and western parts

of the State by rail with a new public-private venture.[1] Moreover, the State invested the lion's share of the capital: two-thirds of the initial $3 million capitalization and an additional $1 million just four years later. NCRR's charter gave it powers of eminent domain and the liberty to build widely, "across or along any public road or water source." An Act to incorporate the North Carolina Rail Road Company, ch. LXXXII, §§ 26–28, 1848–1849 N.C. Laws, 138, 145–50.

¶ 58      The General Assembly's actions in the years since corroborate its original intent to require NCRR to operate for the benefit of the state. In 1992, a State advisory study group issued a report in which it noted that "where the State grants a private corporation special governmental powers, such as eminent domain, those powers are to be used for the public benefit," and public-private partnerships like NCRR are "obligated to carry out the public purpose for which they were chartered." In service to this obligation, the State began buying more of NCRR's shares "to help promote trade, industry, and transportation within the State of North Carolina and to advance the economic interest of the state." An Act to Make Appropriations for

---

[1] NCRR contends that its view of history, that "[the Company] was formed as a private corporation to meet a pressing public need the government had been unable to meet and in which private participation was necessary," is "[c]ontrary to" SELC's "assertion that the Company was created 'for the benefit of the State.' " This is an attempt to draw a distinction without a difference. It benefits the State when the government charters a company to build a railroad connecting the ends of the State to one another and provides the majority of the start-up capital. An action undertaken to "meet[ ] a pressing public need" is an action undertaken "for the benefit of the State." Here, the private nature of the corporation does not alter the General Assembly's intention, which was to create a railroad to serve North Carolina and its people.

Current Operations and for Capital Improvements for State Departments, Institutions, and Agencies, and for Other Purposes, ch. 443 § 32.30, 1997 N.C. Sess. Laws 1344, 1842–1844. This is not to say, of course, that any public-private venture necessarily becomes subject to the Public Records Act. However, where the venture is wholly owned and controlled by the State, it seems self-evident that the "public" part of the venture holds more import than that which is "private," at least for the purposes of the Public Records Act.

¶ 59        Second, and separately, the legislature enacted the Public Records Act to enable public inspection of the workings of the state government and its agencies, not to create formalistic hideouts for public-private partnerships that wish to escape scrutiny. Sorely missing from the majority's "totality of the circumstances analysis" is any meaningful evaluation of the scope and purpose of the Public Records Act. In my view, the General Assembly's motivations for passing the Public Records Act suggest it intended entities like NCRR to fall within the Act's purview.

¶ 60        The first North Carolina public records statute affirmed that public records are "the chief monuments of North Carolina's past and are invaluable for the effective administration of government [and] for the conduct of public and private business." An Act to Safeguard Public Records in North Carolina, ch. 265, § 1, 1935 N.C. Sess. L., 288. This statute and its 1975 successor are in keeping with American common law's centuries-old recognition of the public's right to inspect public records. *See*

Joseph D. Johnson, *Administrative Law—Public Access to Government-Held Records: A Neglected Right in North Carolina*, 55 N.C. L. Rev. 1187 (1977). Historically, our appellate courts have agreed. Given the legislature's "mandate for open government," *News & Observer Pub. Co., Inc. v. Poole*, 330 N.C. 465, 475 (1992), "it is clear that the legislature intended to provide [through the Public Records Act] that, as a general rule, the public would have liberal access to public records." *News & Observer Pub. Co. v. State ex rel. Starling*, 312 N.C. 276, 281 (1984). This is because "[g]ood public policy is said to require liberality in the right to examine public records." *Advance Publ'ns, Inc. v. Elizabeth City*, 53 N.C. App. 504, 506 (1981). Just last year, this Court affirmed this principle:

> The Act is intended to be liberally construed to ensure that governmental records be open and made available to the public, subject only to a few limited exceptions. The Public Records Act thus allows access to all public records in an agency's possession "*unless* either the agency or the record is specifically exempted from the statute's mandate." *Times-News*, 124 N.C. App. at 177, 476 S.E.2d at 452 (emphasis added). "Exceptions and exemptions to the Public Records Act must be construed narrowly." *Carter-Hubbard Publ'g Co.*, 178 N.C. App. at 624, 633 S.E.2d at 684.

*DTH Media Corp. v. Folt*, 374 N.C. 292, 300–01 (2020).

Liberal access to public records is, of course, not the same as liberal construction of what is a public record. But there, too, our lawmakers have recognized the importance of granting the people ready access to records concerning the

operations and transactions of their government: "It is an uncontestable pre-condition of democratic government that the people have information about the operation of their government . . . ." Sam J. Ervin, Jr., *Controlling "Executive Privilege,"*, 20 Loy. L. Rev. 11, 11 (1974). At bottom, "[w]hile some degree of confidentiality is necessary for government to operate effectively, the general rule in the American political system must be that the affairs of government be subject to public scrutiny.*"* Johnson, 55 N.C. L. Rev. at 1188. Today's decision undermines that principle.

¶ 62      "In matters of statutory construction, our primary task is to ensure that the purpose of the legislature, the legislative intent, is accomplished." *Elec. Supply Co. of Durham, Inc. v. Swain Elec. Co., Inc.*, 328 N.C. 651, 656 (1991). That purpose is "first ascertained from the plain words of the statute." *Id.* When the General Assembly passed the Public Records Act, it was so the public would have insight into how decisionmakers were going about their work, how public policy was being enacted, and how the agencies of North Carolina were being operated. Indeed, the Act applies to records produced by an "agency" which are "made . . . in connection with the transaction of *public business*." N.C.G.S. § 132-1(a). Furthermore, the legislature provided an expansive definition of what might be considered an agency. As discussed above, if we were to apply the rule which has been the law in our state for the past forty years, NCRR falls firmly within the meaning of "agency." While some government entities are enumerated, the language of the statute considers that not

all could be named specifically:

> Agency of North Carolina government or its subdivisions shall mean and *include every* public office, public officer or official (State or local, elected or appointed), institution, board, commission, bureau, council, department, authority *or other unit of government* of the State or of any county, unit, special district or other political subdivision of government.

N.C.G.S. § 132-1 (emphasis added). If we were to place NCRR within the definition of "agency" within the statute, it would fit well within "institution" and certainly within the catchall of "other unit of government."

¶ 63      In our consideration of the statues relevant to this case, we should "adopt an interpretation which will avoid absurd or bizarre consequences." *State ex rel. Com'r of Ins. v. N.C. Auto. Rate Admin. Office*, 294 N.C. 60, 68, (1978). An interpretation that results in an entity created by the State for public benefit shielding its records from public scrutiny is an absurd one. Accordingly, I reject the necessary premise of the majority's decision which says that the legislature, in enacting the 1975 Public Records Act, intended to permit the State or a related entity to hide from scrutiny merely by conducting its operations behind the corporate form.

¶ 64      The majority, as did the Business Court, makes much of a 2011 report from the General Assembly's Program Evaluation Division (PED), which is "a staff agency of the General Assembly . . . [purposed to provide] an independent, objective source of information to be used in evaluating" the activities of state agencies or those of

non-state entities conducted using state funds. N.C.G.S. § 120-36.11(a) (2019). In that 2011 report, as was well-documented by both parties, the PED found that "[NCRR] is not subject to the State's [Public Records Act]." Both parties rightly recognize that whether NCRR is subject to the Public Records Act, a question of law, is a determination to be made by this court, not by a staff agency of the General Assembly.[2] The PED report, then, adds little to our analysis.

¶ 65          As the majority notes, in advance of the PED study of NCRR, the General Assembly passed legislation stipulating that "[f]or the purposes of [the] evaluation, the terms 'State agency' or 'agency'" would include NCRR. An Act to Make Technical, Clarifying, and Other Modifications to the Current Operations and Capital Improvements Appropriations Act, S.L. 2011-391, § 52, 2011 N.C. Sess. Law No. 1557, 1584–85. The majority claims that that "this language tends to suggest a recognition on the part of the General Assembly that [NCRR] was not a state agency," but this does not follow in light of the issue before us. It seems instead that the legislature thought it necessary to define the NCRR as a "State agency" for the limited purpose of the evaluation. I believe the Public Records Act contemplates the same—that a corporate entity can be considered a state agency for some purposes,

---

[2] Whether the NCRR is subject to the Public Records Act, a narrow question of law, is also not a determination to be made by the Attorney General or the State Ethics Commission in their realms of authority, though the majority points to decisions by both as "persuasive" in support of its ruling.

but not all.

¶ 66    The majority advances two further arguments by pointing to General Assembly activities in the wake of the PED report. Neither is availing. Both arguments focus on a 2013 statute imposing "additional reporting requirements," N.C.G.S. § 124.17. In that legislative process, the General Assembly—equipped with the 2011 PED report which stated NCRR was not subject to the Public Records Act— "deci[ded] to adopt" the recommendations in the report, a decision the majority reads to mean the General Assembly "agreed with" the PED's assessment of NCRR. However, it is just as likely that the General Assembly disagreed with the PED report and saw no need to act in light of it. In other words, the General Assembly did not bring NCRR within the auspices of the Act in 2013 because they believed NCRR to already be there. The PED is, after all, a staff agency of the General Assembly. It is unlikely that, faced with a report containing an inaccuracy from one of its staff agencies, the General Assembly would see a need to respond with legislation to correct the error.

¶ 67    The majority also points to the provisions of the 2013 statute that imposed those additional reporting requirements, arguing that such legislation would be superfluous if NCRR were already a state agency. This position defies the plain reading of the 2013 statute. The statute is indeed meant to provide for an "*[e]nhanced* annual report." N.C.G.S. § 124-17 (emphasis added). NCRR is mandated to "submit

an annual report to the Joint Legislative Commission of Governmental Operations and the Joint Legislative Transportation Oversight Committee." N.C.G.S. § 124-17(a). In other words, the Public Records Act imposes no affirmative obligation on NCRR to produce a report or records—the 2013 statute does. An entity subject to the Public Records Act is only required to make some of its records made available on request. The 2013 statute, on the other hand, establishes an affirmative reporting requirement for NCRR to regularly provide information to certain state government entities. As a result, the reporting requirements of the 2013 statute say nothing about whether NCRR was already subject to the requirements of the Public Records Act.

¶ 68        The majority's argument regarding the 2013 statute is called into further question by a comparison of the text of that statute to the text of the Public Records Act. The 2013 statute requires that NCRR, "[u]pon the request of the Governor or any committee of the General Assembly . . . provide *all* additional information and data within its possession or ascertainable from its records." N.C.G.S. § 124-17(b) (emphasis added). The Public Records Act, however, only applies to information "made or received pursuant to law or ordinance in connection with the transaction of public business." N.C.G.S. § 132-1(a). These obligations are not the same. The 2013 statute compels NCRR to provide *all* information by request of the Governor or legislature; the Public Records Act makes available only information related to public businesses.

¶ 69        The majority attempts a similar line of reasoning with respect to the 2013 statute's provision allowing NCRR to "indicate whether the information [provided upon request of the Governor or General Assembly] is confidential." N.C.G.S. § 124-17(b). Were NCRR subject to the Public Records Act, it might possess information that is not covered by the Act, but which would otherwise become subject to the Act upon fulfilling a request for information from the Governor of the General Assembly pursuant to Section 124-17(b). This provision, then, does not prove extraneous to the Public Records Act or any of NCRR's obligations under it. Instead, it provides additional safeguards for the enhanced reporting requirements the legislature has chosen to impose on NCRR.

¶ 70        Ultimately, I am unpersuaded by the evidence cited by the majority for the proposition that NCRR should not be subject to the Public Records Act. Rather, I believe a more just and accurate reading of the legislature's intent in passing the Public Records Act and in creating NCRR is that NCRR is subject to the Act.[3]

### III.    Conclusion

---

[3] Whether the specific records sought by SELC are covered by the Act's requirements is a separate question not before us here. However, there is no denying that the public has been impacted by NCRR's decision to abandon a light rail project in the Triangle. Public/private partnerships for the public good are not new.  It is equally still true that the public's trust in government suffers when government decision-making is shielded from public view. "The generation that made the nation thought secrecy in government one of the instruments of Old World tyranny and committed itself to the principle that a democracy cannot function unless the people are permitted to know what their government is up to." *EPA v. Mink*, 410 U.S. 73, 105 (1973) (Douglas, J. dissenting) (quoting Henry Steele Commager).

¶ 71        Subjecting NCRR to the Public Records Act would not grant the people of North Carolina unfettered access to NCRR's records. As discussed, the Public Records Act only applies to records "made or received pursuant to law or ordinance in connection with the transaction of public business." N.C.G.S. § 132-1(a). NCRR maintains the right to indicate that other information is confidential when it is "related to a proposed specific business transaction where inspection, examination, or copying of the records would frustrate the purpose for which the records were created." N.C.G.S. § 124-17(b), (c). NCRR, then, would still be permitted to limit the public's access to its records. But given the deeply intertwined relationship between NCRR and the State, those records which are sufficiently connected "with the transaction of public business" should be made available for public scrutiny.

¶ 72        I agree with the majority that our approach to interpreting statutes must always reckon with the "totality of the circumstances." The circumstances to be considered here include both the scope and purpose of the Public Records Act and the legislation governing the NCRR's activities. Because I believe the legislature's intent was for the Public Records Act to make more, not less, of our government's activities and operations available for public examination, and because I read our state's prior appellate cases and the General Assembly's actions as indicating that the North Carolina Railroad Company, owned fully by the State of North Carolina and obligated in several ways to its branches of government, should be subject to the Public Records

Act, I respectfully dissent.

Justice HUDSON joins in this dissenting opinion.